SHAMPTON ET AL., APPELLEES, *v.* CITY OF SPRINGBORO ET AL., APPELLANTS.

[Cite as *Shampton v. Springboro,*
98 Ohio St.3d 457, 2003-Ohio-1913.]

(No. 2001–2251—Submitted January 22, 2003—Decided April 30, 2003.)

---

FRANCIS E. SWEENEY, SR., J.

{¶ 1} In 1995, appellant, the city of Springboro, owned and operated the Heatherwoode Golf Course. The city leased a restaurant on the golf course grounds to a private operator. In January 1995, the city commenced a search to replace the departing restaurant operator and eventually selected Michael

Shampton. Shampton formed Two Victor Company, Ltd. ("Two Victor"), to lease and run the restaurant.

{¶ 2} In early April 1995, Springboro City Manager Edward Doczy began negotiating with Shampton for a long-term lease agreement between Two Victor and the city. After much negotiation, Doczy created a document titled "Heatherwoode Clubhouse Restaurant Negotiation Issues." This document addressed a number of long-term lease issues and listed a "[p]roposed lease" term of "15 years with 3–year re-negotiation provisions." The document contained 30 numbered paragraphs detailing the terms of a long-term lease. This document was not signed and, in fact, does not contain signature lines. Paragraph 21 of the document states the following:

{¶ 3} "Property tax issues will be further discussed with the benefit of legal counsel."

{¶ 4} Likewise, paragraph 22 of the document states:

{¶ 5} "Property and liability insurance will be further discussed with the benefit of legal counsel."

{¶ 6} Finally, paragraph 29 reads:

{¶ 7} "Implementation schedule: It is the intent of the City and the Operator to enter into a temporary agreement on or about April 21, 1995. The Operator would take over existing food and beverage operations at the golf course and clubhouse on or before May 1, 1995. The main restaurant would be open with lunch or diner [sic] menu and table service during the week of May 21, 1995. The City and Operator will develop completion dates for renovations and remodeling prior to the signing of a long-term lease. The long-term lease is to be created and signed no later than _____."

{¶ 8} Unable to quickly complete a long-term agreement with Shampton, Doczy asked the Springboro City Council to issue a resolution authorizing him to enter into a temporary lease with Two Victor so that Two Victor could begin operating the restaurant before the start of the summer golf season. In response, the city council passed Resolution No. R–95–32, which provided:

{¶ 9} "A RESOLUTION AUTHORIZING THE CITY MANAGER TO ENTER INTO A TEMPORARY LEASE AGREEMENT WITH THE SELECTED OPERATOR OF THE GREENS RESTAURANT

{¶ 10} "WHEREAS, after considering numerous applicants, the City Manager has tentatively selected an operator for the Greens Restaurant; and

{¶ 11} "WHEREAS, negotiations are ongoing for a long-term lease with such operator; and

{¶ 12} "WHEREAS, it is the desire of the City and the operator that the operator be permitted to enter upon the premises and commence restaurant

operations, subject to the rental amounts shown on the attached Schedule of Rents, and in accord with other interim arrangements as determined by the City Manager;

{¶ 13}  "* * *

{¶ 14}  "The City Manager is hereby authorized to enter into a temporary lease agreement with the operator tentatively selected under such terms and conditions as he sees fit, monthly rental payments to be in accord with the attached Schedule of Rents.

{¶ 15}  "* * *

{¶ 16}  "The City Manager shall proceed as expeditiously as possible toward the completion of negotiations for a long-term lease agreement."  (Capitalization sic.)

{¶ 17}  Pursuant to the authority given to him under the resolution, Doczy, on behalf of the city, executed a temporary lease with Two Victor.  It provided that either party could terminate the lease without cause by giving 30 days' notice, and stated that "[t]he parties specifically intend that this Lease Agreement shall continue in effect only until a long-term lease containing more detailed terms and conditions can be negotiated and executed."  Despite this provision, no long-term lease was ever executed.

{¶ 18}  Shampton closed a restaurant that he had been operating elsewhere and, as the manager of Two Victor, began running the restaurant at Heather-woode, making substantial financial investments in that facility.  In the summer of 1996, the city was apprised that the restaurant would probably not be exempt from property taxes if it were run by a private party under a lease.  Under the terms of the temporary lease, Two Victor was obligated to pay any taxes incurred by the restaurant, but when Doczy told Shampton that the restaurant would not be exempt from property taxes, Shampton told Doczy that he wanted a contract under which Two Victor would not be responsible for the property taxes.

{¶ 19}  On October 25, 1996, Doczy sent a letter to Shampton notifying him that the city was terminating its temporary lease with Two Victor as of December 31, 1996, and would not enter into a long-term lease.  The letter presented Shampton with the option of entering into an agreement whereby the company managing the golf course would supervise Shampton.  It also stated that Doczy was willing to consider any alternate proposal that Shampton would make by November 15, 1996.  Shampton informed the city that he was not interested in running the restaurant under the supervision of the company managing the golf course operator, and Two Victor vacated the restaurant facilities in January 1997.

{¶ 20}  Shortly thereafter, Shampton and Two Victor, appellees herein, filed suit against the city, alleging breach of contract and promissory estoppel.  A jury

returned a verdict in favor of appellees and awarded them $85,000 on their breach-of-contract claim and $120,000 on their claim of promissory estoppel. The court of appeals upheld the trial court's judgment. This court accepted jurisdiction upon the city's discretionary appeal.

{¶ 21} The dispute at hand requires us to determine whether the city manager, Doczy, had authority under the Springboro Municipal Charter and Resolution No. R–95–32 to bind the city to a long-term lease. The city asserts that the lower courts erred in failing to recognize the contracting limitations that the charter and the resolution imposed on its city manager.

{¶ 22} As a starting point, we look to Section 6.02 of the Springboro Charter, which states:

{¶ 23} "The Manager shall have the following powers and duties:

{¶ 24} "* * *

{¶ 25} "(i) To arrange, prepare and sign contracts, franchises and agreements, in cooperation with the Village Solicitor/City Attorney, but no such contracts, franchises or agreements shall be legal until ratified or authorized by ordinance or resolution of the Council * * *."

{¶ 26} In *Lathrop Co. v. Toledo* (1966), 5 Ohio St.2d 165, 172–173, 34 O.O.2d 278, 214 N.E.2d 408, we stated:

{¶ 27} "Many times this court has held that no recovery can be had on a contract that is entered into contrary to one or more of the legislated requirements. * * *

{¶ 28} "A thread running throughout the many cases the court has reviewed is that the contractor must ascertain whether the contract complies with the Constitution, statutes, charters, and ordinances so far as they are applicable. If he does not, he performs at his peril."

{¶ 29} Here, the charter reads that the city manager is within his duties to arrange, prepare, and sign contracts. But it also provides that any such contract is not legal until the city council, by ordinance or resolution, either ratifies the contract or authorizes the city manager to bind the city. Appellees assert that Resolution No. R–95–32 authorized Doczy to enter into a long-term lease. We find that it did not.

{¶ 30} Just as when interpreting statutory provisions, the starting point for discerning the meaning of a municipal resolution or ordinance is to look at its plain terms. In the instant matter, the resolution expressly authorized Doczy to bind the city to a temporary lease agreement with Two Victor, stating that "[t]he City Manager is hereby authorized to enter into a temporary lease agreement." The operative words in that phrase are "authorized" and "enter." Clearly, the word "authorized" is a delegation of power from the council to its city manager in

accordance with Section 6.02 of the charter, while the word "enter" gives unequivocal permission for him to bind the city to a temporary lease. In contrast, the next portion of the resolution instructs the city manager to "proceed as expeditiously as possible toward the completion of negotiations for a long-term lease agreement." The use of different language with respect to the long-term lease is a clear indication that the resolution did not authorize the city manager to enter into such an agreement without further approval of its terms by city council.

{¶ 31} Furthermore, in any event we find that Doczy never entered into a contract with Two Victor. Although appellees admit that the city and Two Victor never executed a long-term lease, they assert that Doczy and Shampton agreed on the terms set forth in the Negotiation Issues document that Doczy created and thereby formed a contract. However, the very substance of that document demonstrates that some material terms had not yet been agreed upon, including which party would be responsible for paying property taxes. Therefore, there was no long-term agreement in existence that appellees could claim was breached.

{¶ 32} Appellees were also successful in the trial court on their claim of promissory estoppel. This court has adopted the doctrine of promissory estoppel that was set forth in the Restatement of the Law 2d, Contracts (1981), Section 90:

{¶ 33} "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." See *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 439, 662 N.E.2d 1074.

{¶ 34} To be successful on a claim of promissory estoppel, "[t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630, citing *Heckler v. Community Health Serv.* (1984), 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42. Persons seeking to enter into a contractual relationship with a governmental entity are on constructive notice of the statutory limitations on the power of the entity's agent to contract. *Bohach v. Advery*, Mahoning App. No. 00–CA–265, 2002-Ohio-3202, 2002 WL 1396744. Since state and local laws are readily available for public review, it is a simple matter for a party to educate itself as to the procedural formalities with which government officials must comply before they may bind a governmental entity to a contract. Here, as noted previously, the charter and Resolution No. R–95–32 clearly did not grant Doczy the authority

to enter into a long-term lease. As a result, even if Doczy did make any promises regarding the long-term lease, appellees could not have reasonably relied upon them. Liability does not attach to the city based on appellees' mistaken interpretation of the resolution. Thus, appellees' claim of promissory estoppel is without merit.

{¶ 35} Our decision in this case is consistent with long-held principles of this court. " 'An occasional hardship may accrue to one who negligently fails to ascertain the authority vested in public agencies with whom he deals. In such instances, the loss should be ascribed to its true cause, the want of vigilance on the part of the sufferer, and statutes designed to protect the public should not be annulled for his benefit.' " *Lathrop Co. v. Toledo* (1966), 5 Ohio St.2d 165, 173, 34 O.O.2d 278, 214 N.E.2d 408, quoting *McCloud & Geigle v. Columbus* (1896), 54 Ohio St. 439, 452–453, 44 N.E. 95. Accord *Lancaster v. Miller* (1898), 58 Ohio St. 558, 51 N.E. 52. Protection of the public's resources in this context sometimes comes with a cost to misinformed parties.

{¶ 36} In summary, there was never an agreement to the terms of a long-term lease, and even if an agreement had been reached, it would be invalid because Doczy, as evident in the charter and Resolution No. R–95–32, did not have authority to enter into a long-term lease. Thus, appellees' claims for breach of contract and promissory estoppel are without merit. Accordingly, we reverse the judgment of the court of appeals.

Judgment reversed.

MOYER, C.J., RESNICK, WHITMORE, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

PFEIFER, J., dissents.

BETH WHITMORE, J., of the Ninth Appellate District, sitting for COOK, J.

---

**PFEIFER, J., dissenting.**

{¶ 37} I trust the jury verdict in this case. Resolution No. R–95–32 required the city manager to finalize a long-term agreement with Shampton: "The City Manager shall proceed as expeditiously as possible toward the completion of negotiations for a long-term lease agreement." By charter, the city manager has within his enumerated powers the ability "[t]o arrange, prepare and sign contracts," although "no such contracts * * * shall be legal until ratified or authorized by ordinance or resolution of the Council * * *." The jury heard testimony from council members and found that city council had indeed authorized the city manager to enter into a long-term lease with Shampton. The jury found that there had been a meeting of the minds between Shampton and the city manager.

As a contract that was *authorized* by city council, the agreement entered into between Shampton and the city manager was valid.

{¶ 38} At the very least, the city council gave the city manager the authorization to negotiate the long-term lease. As part of his negotiations, the city manager made certain representations to Shampton, including the representation that the written lease was forthcoming. The jury found that the city manager's representations induced Shampton to act to his detriment. As those representations were authorized by the city council's resolution, the jury's verdict should stand.

―――――――

David A. Chicarelli and John D. Smith, for appellees.

Calfee, Halter & Griswold, L.L.P., Mark I. Wallach and Maura L. Hughes; Eckert & Eckert Co., L.P.A., Roger C. Eckert and Michael C. Eckert, for appellant.

Barry M. Byron and Stephen L. Byron, urging reversal for amicus curiae Ohio Municipal League.

Michael H. Cochran, urging reversal for amicus curiae Ohio Township Association.