**SPECTRUM BENEFIT OPTIONS, INC. et al., Appellants,**

v.

**MEDICAL MUTUAL OF OHIO, Appellee.**

[Cite as *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 174 Ohio App.3d 29, 2007-Ohio-5562.]

Court of Appeals of Ohio,
Fourth District, Athens County.

Nos. 06CA19 and 06CA20.

Decided Oct. 11, 2007.

32

**34**

David J. Winkelmann, for appellants.

Michael E. Smith and Mark L. Rodio, for appellees.

Per Curiam.

{¶ 1} This is an appeal from an Athens County Common Pleas Court summary judgment in favor of Medical Mutual of Ohio ("MMO"), defendant below and appellee herein. Spectrum Benefits Options, Inc. ("SBO" or "Cowden")[1] and Council of Governments–Southeast Ohio Voluntary Education Cooperative ("SEOVEC"), plaintiffs below and appellants herein, assign the following errors for review:

First Assignment of Error:

The trial court erred in finding there was no written contract between MMO, SBO and SEOVEC.

Second Assignment of Error:

MMO is barred by the doctrine of promissory estoppel from asserting a statute of frauds defense.

{¶ 2} This case involves the breach of an alleged agreement to provide medical insurance to a consortium of schools, known as SEOVEC. In early 2001, SBO, a benefits-consulting company, began to explore the possibility of forming a medical-insurance consortium with SEOVEC. SBO contacted MMO to see whether it would be interested in insuring members of the consortium at reduced rates. MMO expressed an interest in the proposed consortium.

{¶ 3} In July 2001, David Chiappino of SBO sent to MMO's chief underwriter and vice-president of educational sales and service, George Stadtlander, an

---

1. Spectrum Benefits Options, Inc. changed to Cowden & Associates, Inc. in late 2003.

"outline for the SEOVEC Medical Consortium project" as "a starting point." In August 2001, SEOVEC issued a "Vendor Endorsement" and stated that it would use MMO as the exclusive insurer. In November 2001, MMO issued a quote to a member of SEOVEC. SBO advised MMO that it needed to "hold off," because the "infrastructure [was] not in place," and the parties needed to agree upon premium rating.

{¶ 4} On February 23, 2002, SBO prepared a "Draft Summary of Proposed SEOVEC Health Plan Alliance, Inc., Cowden & Associates, and Medical Mutual of Ohio" and outlined the "background, roles, and compensation." The document stated that the "SEOVEC Health Plan Alliance, Inc. (the 'Alliance') based on the recommendation of Spectrum Benefit Options, Inc. d/b/a Cowden & Associates (C & A) has decided to sponsor a medical insurance purchasing cooperative." It explained that Cowden, "under an exclusive arrangement with the Alliance has: (1) Contacted member schools to determine the level of interest in a medical purchasing alliance; (2) Determined that an adequate level of intent exists to seriously pursue such an alliance; (3) Determined that based on geography and level of interest, the best insurance partner was Medical Mutual of Ohio (MMO); (4) Negotiated with MMO for favorable terms of offering; [and] (5) Worked with legal counsel retained by C & A to create a legal framework for consideration by the Alliance and it's [sic] legal counsel." The document also outlined program objectives and the "key roles" of the "key organizations," including the following roles for MMO "(or other carrier selected)": (1) assumption of risk, (2) claims administration, (3) network management, (4) calculating global rate adjustments—initial and renewal, (5) distributing compensation as agreed upon to brokers and Cowden, (6) distributing monthly overall computerized billing eligibility lists to Cowden or directly to the schools, (7) preparing necessary utilization and usage-pattern reports as reasonably requested by Cowden, and (8) providing agreed-upon monthly experience data to Cowden.

{¶ 5} The document also stated that "C & A and MMO will be retained on an exclusive basis for a minimum of two (2) years from the date of the first official offering, anticipated to be May 1, 2002." Regarding Cowden's compensation, the document stated, "It is understood that C & A has expended hundreds of hours of effort in preliminary analysis, communications, negotiations, legal work and implementation of the program and that C & A will take a minimum of four (4) years to recoup these expenses. In partial recognition of those efforts, SEOVEC during the development phase of this offering, committed to a two year minimum for C & A services. As the further development has required very significant additional time and expense, it is understood that except for failure to provide a reasonable level of service, C & A will remain as the primary consultant for five

(5) years." The document contained signature lines for representatives of the three parties, but no one signed the document.

{¶ 6} On February 25, 2002, Jere L. Cowden of SBO sent an e-mail to Stadtlander, explaining that he would send the above document. The e-mail reads: "This draft document will contain signature lines for SEOVEC, MMO and C & A; obviously there will be discussion & some clarifications before any signatures are possible and I am not sure this will be feasible from MMO's viewpoint * * * [W]e are trying to tie up some loose ends * * * to make sure we are not out of line when we hold a broker meeting early next month to kick the offering off. I hope to talk with you latter [sic] this week to review the status of this offering and to get your reaction to the above mentioned summary of roles and responsibilities."

{¶ 7} On that same date, Cowden sent Ronald Smith of SEOVEC and Stadtlander a letter explaining that within the draft summary, he "attempted to capture the essence of prior written and verbal agreements." He further stated that the "concept is for each organization to review and after final changes are made to have the document signed by the appropriate executive of each entity."

{¶ 8} Cowden stated in his deposition that no one at MMO commented on the draft summary and that he did not really expect anyone at MMO to sign the document.

{¶ 9} On March 11, 2002, MMO sales consultant Carolyn Thomas sent Chiappino a copy of the letter that MMO would be sending to the brokers. The letter reads: "[SEOVEC] appointed [MMO] as the exclusive medical insurance carrier for those school districts participating in the SEOVEC Medical Consortium. Since that time, we have been working with SEOVEC and their Consultant, Cowden & Associates, on the Underwriting, Marketing and Trust Agreement for the consortium. * * * We are finally ready to offer the SEOVEC Medical Consortium to your groups, but we realize you probably have many questions. Although we initially thought a kick-off meeting would be held, conflicts in many schedules prevented this. SEOVEC's consultant, however, is available * * *."

{¶ 10} Apparently, in spring or early summer 2002, MMO began to have concerns about the consortium. On May 14, 2002, MMO underwriter Steve Attaway sent an e-mail to MMO chief marketing officer Errol Brick explaining that he "was waiting on Legal approval of the agreement and then planning to share it with Jan Persinger and Chuck Braschwitz. If you have a problem with 'political' type issues with other producers or customers I guess I need to know that so we can address those with Cowden. * * * We have nothing in it now and they are not beating down our doors."

{¶ 11} On June 17, 2002, Thomas sent a letter to Chiappino, stating that she had a meeting with Brick, Stadtlander, and Attaway to discuss SEOVEC and decided that "1,000 new contracts must be enrolled into SEOVEC by July 1, 2003. If less than 1,000 new contracts are enrolled by that time the rating factors will be re-evaluated."

{¶ 12} In a June 24, 2002 letter, Chiappino responded:

I have received your letter dated June 17, 2002, in which you outline the changes that had been made to the agreement between Cowden & Associates and MMO. While I am concerned that we were not included in the discussion regarding the changes, I am more concerned that at least 2 superintendents and one broker knew of a "problem" and questioned the viability of The Alliance.

Clearly there is no problem, and we are pleased to have MMO as our partner in this project. In an effort to minimize any communication issues in the future I would like to ask for your help in setting up a meeting with Errol Brick.

{¶ 13} In a July 30, 2002 e-mail, Thomas inquired of a Patricia Decensi whether SEOVEC ever sent MMO a contract. Decensi responded that she had never received anything and that Brick told her not to sign anything with that organization. In July or August 2002, MMO stopped issuing quotes to SEOVEC members. On August 23, 2002, Cowden sent Brick a letter to address MMO's refusal to issue further quotes. Cowden wrote:

Under our agreement, MMO is required to issue discounted quotes to qualifying SEOVEC members upon the agreed terms for the minimum two (2) year period.

MMO initially issued a number of quotes, per the terms of our agreement, to qualifying members. Recently, however, MMO has refused to issue proposals to qualifying members who have submitted requests. This is a breech [sic] of the agreement.

{¶ 14} On October 30, 2003, SBO and SEOVEC filed a complaint against MMO and alleged that MMO had breached (1) the express terms of the "Alliance Agreement," (2) an oral contract implied in fact, and (3) an implied contract. Appellants further asserted claims for a breach of the covenant of good faith and fair dealing and fraudulent inducement. Appellants attached to their complaint the so-called "Alliance Agreement," which was titled "Summary of Proposed Spectrum Benefit Options/Medical Mutual of Ohio Partnership Offering to Southeast Ohio Voluntary Educational Cooperative." The proposal stated that Spectrum recommended to form a partnership with MMO. They also attached a "Draft Summary of Proposed SEOVEC Health Plan Alliance, Inc.," prepared February 23, 2002.

{¶ 15} Appellee requested summary judgment regarding appellants' claims for breach of written contract, breach of oral contract, and breach of implied contract. Appellee contended that (1) no evidence exists to show that the parties entered into a written contract, (2) the statute of frauds bars appellants' breach-of-oral-contract claim, and (3) appellants cannot recover under the theory of implied contract/unjust enrichment because appellee did not receive a benefit. Appellee asserted that while the parties contemplated entering into a formal agreement, the parties did not sign or agree to a final agreement. Appellee asserts that it only issued "initial quotes to several individual school districts on a case-by-case basis to determine whether the proposed consortium might be profitable. When Medical Mutual determined it was simply insuring its existing clients at lower rates, it decided not to participate in the consortium. [Appellants'] unfulfilled hope that Medical Mutual would decide to enter into a binding three-party agreement for a minimum two-year period does not give [appellants] a right to recovery against Medical Mutual." Appellee did not dispute that it engaged in discussions with appellants, but that the discussions never resulted in a final, written agreement.

{¶ 16} Appellee additionally argued that appellants could not rely upon part performance of the alleged contract to remove the statute-of-frauds bar because the alleged agreement to provide insurance to the consortium is a personal-service contract and that the part-performance doctrine does not apply to personal-service contracts.

{¶ 17} On August 15, 2005, appellants voluntarily dismissed their claims for breach of implied covenant of good faith and fair dealing and fraudulent inducement. On that same date, they filed their response to appellee's summary judgment motion. Appellants argued that the record contains several writings that appellee signed, which, along with other documents, show that the parties reached an agreement.

{¶ 18} On May 12, 2006, the trial court granted appellee summary judgment. The court concluded that no genuine issues of material fact remained regarding appellants' claims for breach of written contract, breach of oral contract, or breach of implied contract. This appeal followed.

I

{¶ 19} Appellants' two assignments of error challenge the propriety of the trial court's decision to grant MMO summary judgment. Therefore, we consider the assignments of error together.

{¶ 20} In their first assignment of error, appellants contend that the trial court erred by determining that no genuine issue of material fact remained regarding

whether the parties entered into a written contract and by determining that the statute of frauds applied. In their second assignment of error, appellants argue that the trial court erred by failing to conclude that the doctrines of promissory estoppel and part performance removed the contract from the operation of the statute of frauds.

A

## SUMMARY JUDGMENT STANDARD

{¶ 21} Appellate courts review trial court summary judgment decisions de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Accordingly, appellate courts independently review the record to determine whether summary judgment is appropriate. Appellate courts need not defer to trial-court decisions. See *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153; *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 411–412, 599 N.E.2d 786. Thus, to determine whether a trial court properly entered summary judgment, an appellate court must review the Civ.R. 56 summary judgment standard as well as the applicable law. Civ.R. 56(C) provides:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶ 22} Thus, a trial court may not grant summary judgment unless the evidence demonstrates that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and after viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. See, e.g., *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 429–430, 674 N.E.2d 1164.

## II

{¶ 23} In their first assignment of error, appellants assert that the trial court erred by granting appellee summary judgment on the claim for breach of written contract. In particular, appellant's contend that the court erred by determining that no genuine issues of material fact remained as to whether the parties entered into a binding, written contract. Appellants argue that although the parties did not execute an integrated document to memorialize their agreement, they did memorialize their agreement through several e-mails, faxes, and letters. Within their first assignment of error, appellants further assert that the trial court erred by determining that the statute of frauds applied.

{¶ 24} Appellee argues that appellants failed to produce any evidence to show that it intended to be bound by any alleged agreement. Appellee disputes appellants' claims that the series of letters and e-mails proves the existence of a written contract. Appellee additionally asserts that the trial court correctly determined that the statute of frauds applied.

## A

## BREACH OF WRITTEN CONTRACT

{¶ 25} " 'A breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach.' " *All Star Land Title Agency, Inc. v. Surewin Invest., Inc.,* Cuyahoga App. No. 87569, 2006-Ohio-5729, 2006 WL 3095701, at ¶ 19, quoting *Phillips v. Spitzer Chevrolet Co.,* Stark App. No. 2006CA00002, 2006-Ohio-4701, 2006 WL 2598336.

{¶ 26} In the case sub judice, the threshold question is whether the parties entered into a binding contract. Generally, courts recognize three types of contracts: express, implied in fact, and implied in law. *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6, 540 N.E.2d 257, citing *Hummel v. Hummel* (1938), 133 Ohio St. 520, 525, 11 O.O. 221, 14 N.E.2d 923; *Sabin v. Graves* (1993), 86 Ohio App.3d 628, 633, 621 N.E.2d 748, 751–752; see also *Vargo v. Clark* (1998), 128 Ohio App.3d 589, 595, 716 N.E.2d 238. In an express contract, the parties assent to the terms as actually expressed through the offer and acceptance. Id. In a contract implied in fact, the meeting of the minds is shown by the surrounding circumstances that demonstrate that a contract exists as a matter of tacit understanding. Id. In contracts implied in law, civil liability attaches by operation of law upon a person who receives benefits that he is not entitled to

retain. Id. Contracts implied in law are not true contracts, but quasi-contracts or constructive contracts that courts impose to prevent unjust enrichment. Id.

{¶ 27} In the case at bar, appellants challenge the trial court's decision relating to its claim for breach of an express, or written, contract. Appellants do not, however, raise any argument on appeal that the parties entered into an implied-in-fact or a quasi-contract. Thus, we limit our review to whether the trial court erred by determining that no genuine issue of material fact remained regarding whether the parties entered into an express contract.

{¶ 28} "A contract is generally defined as a promise, or a set of promises, actionable upon breach." *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 16; see also *McSweeney v. Jackson* (1996), 117 Ohio App.3d 623, 631, 691 N.E.2d 303. "[A]n express contract connotes an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound." *McSweeney,* 117 Ohio App.3d at 631, 691 N.E.2d 303, citing *Cuyahoga Cty. Hosps. v. Price* (1989), 64 Ohio App.3d 410, 415, 581 N.E.2d 1125. The essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained-for legal benefit and/or detriment), a manifestation of mutual assent, and legality of object and of consideration. *Kostelnik,* citing *Perlmuter Printing Co. v. Strome, Inc.* (N.D.Ohio 1976), 436 F.Supp. 409, 414. "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Kostelnik,* citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134. Thus, to declare the existence of a contract, the parties must consent to its terms, there must be a meeting of the minds of the parties, and the contract must be definite and certain. *Episcopal Retirement Homes,* 61 Ohio St.3d at 369, 575 N.E.2d 134; see also *Alligood v. Procter & Gamble Co.* (1991), 72 Ohio App.3d 309, 594 N.E.2d 668. "In order to prove the existence of a written contract, the essential elements of the contract must be part of a writing, or part of multiple writings that are part of the same contractual transaction." *Juhasz v. Costanzo* (2001), 144 Ohio App.3d 756, 762, 761 N.E.2d 679.

{¶ 29} In the case at bar, we agree with the trial court's conclusion that no genuine issues of material fact remain as to whether the parties entered into a binding, written contract. Appellants refer to the following documents to demonstrate the existence of a written contract: (1) Attaway's October 11, 2001 letter to Chiappino identifying the agreement; (2) Thomas's November 1, 2001 fax to Chiappino containing the "SEOVEC rates 'as promised'" and stating that the premium rates would be decreased by 4.82%, to remain in effect from December 1, 2001, to January 31, 2003; (3) Attaway's January 4, 2002 e-mail advising Chiappino that commissions and rates were agreed to; (4) Stadtlander's Decem-

ber 17, 2001 statement that he did not "have a big problem with" the rates and commissions; (5) Thomas's question to Attaway whether underwriting "feel[s] we are ready to fly," to which Attaway responded, "[S]ure, why not?"; (6) Thomas's March 11, 2002 fax of a draft broker's letter and her cover letter to Chiappino stating, "Here's the letter which will be sent to each broker.  Thoughts?"; (7) Thomas's signed broker's letter identifying MMO "as the exclusive medical insurance carrier for those school districts participating in·the SEOVEC medical consortium" and stating "[W]e are finally ready to offer the SEOVEC medical consortium to your groups"; and (8) Thomas's June 17, 2002 letter stating that "1,000 new contracts must be enrolled into SEOVEC by July 1, 2003.  If less than 1,000 new contracts are enrolled by that time, the rating factors will be re-evaluated."  Appellants assert that Thomas's June 17, 2002 letter confirms the existence of the agreement under which the parties were operating.

{¶ 30} Construing the foregoing evidence most strongly in appellants' favor, we believe that the documents show that the parties were working on developing an agreement and may have reached an agreement on some issues.  However, the precise terms of the agreement were not in writing.  No evidence exists to demonstrate that MMO agreed, in writing, to act as the consortium's exclusive insurer for a two-year term.  No written agreement exists that requires MMO to continue issuing quotes to the consortium for any length of time.  Thus, appellants' claim that the trial court erred by determining that no genuine issue of material fact remained as to whether a written contract exists is without merit.  While the above evidence, viewed most strongly in appellants' favor, shows the existence of perhaps an oral contract or an implied contract, as we explain below, the statute of frauds bars these claims.  Furthermore, appellants challenge only the trial court's decision relating to its claim for breach of written contract, and not to its claims for breach of an oral or implied contract.

B

STATUTE OF FRAUDS

{¶ 31} Within their first assignment of error, appellants also contend that the trial court erred by determining that no genuine issue of material fact remained regarding whether the statute of frauds applied.

{¶ 32} As relevant here, R.C. 1335.05 provides that "[n]o action shall be brought whereby to charge the defendant * * * upon an agreement that is not to be performed within one year from the making thereof; unless the agreement * * * is in writing and signed by the party to be charged * * *."

{¶ 33} "For over a century, the 'not to be performed within one year' provision of the Statute of Frauds, in Ohio and elsewhere, has been given a literal

and narrow construction. The provision applies only to agreements which, by their terms, cannot be fully performed within a year, and not to agreements which may possibly be performed within a year." *Sherman v. Haines* (1995), 73 Ohio St.3d 125, 127, 652 N.E.2d 698.

{¶ 34} Appellants assert that the contract could have been performed within one year. In support, appellants refer to Thomas's statement that 1,000 new lives must be enrolled within one year or MMO would re-evaluate the rating factors. Appellants contend that the statement means that the agreement could be performed within one year. We disagree. Assuming the existence of a two-year agreement, Thomas's statement does not imply that the agreement would terminate if 1,000 new lives were not enrolled within one year; instead, her statement implies that the contract could be modified after one year if the enrollment figures were not met. In other words, complete compliance with the contract could not be accomplished within one year.

{¶ 35} Moreover, as appellee notes, appellants admitted in their "Supplemental Response to Medical Mutual's Request for Admissions" that the Alliance Agreement could not be completely performed within one year. Request for Admission Number 6 states: "Admit that the alleged Alliance Agreement could not be completely performed within one year." Appellants' response reads that they "admit[ ] that the Agreement called for a two-year initial contract period and, therefore, could not be completed within one year." Thus, appellants' argument that the trial court erred by determining that no genuine issue of material fact remained regarding the statute of frauds defense is unavailing.

{¶ 36} Accordingly, based upon the foregoing reasons, we overrule appellants' first assignment of error.

## III

{¶ 37} In their second assignment of error, appellants contend that the trial court erred by determining that the doctrines of promissory estoppel and part performance did not remove the statute-of-frauds bar.

## A

## PROMISSORY ESTOPPEL

{¶ 38} "Promissory estoppel has been defined by the Restatement of Contracts, 2d as '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' Restatement of the Law 2d, Contracts

(1981) 242, Section 90." *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 852 N.E.2d 716, at ¶ 23; see also *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 439, 662 N.E.2d 1074.

{¶ 39} "To be successful on a claim of promissory estoppel, '[t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading.'" *Shampton v. Springboro*, 98 Ohio St.3d 457, 2003-Ohio-1913, 786 N.E.2d 883, at ¶ 34, quoting *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630.

{¶ 40} The promissory-estoppel doctrine is an exception to the statute of frauds. Under this exception, a promise that the promisor should reasonably expect to induce action or forbearance on the part of the promisee and that does induce the action or forbearance " 'is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise.'" *Lowe v. Phillips*, Montgomery App. No. 20590, 2005-Ohio-2514, 2005 WL 1206911, at ¶ 25, quoting *Gathagan v. Firestone Tire & Rubber Co.* (1985), 23 Ohio App.3d 16, 18, 23 OBR 49, 490 N.E.2d 923. Courts generally apply the promissory-estoppel exception to the statute of frauds defense "only in narrow circumstances." *Beaverpark Assoc. v. Larry Stein Realty Co.* (Aug. 30, 1995), Montgomery App. No. 14950, 1995 WL 516469. First, courts generally apply the exception only if the party asserting it pleaded it as a separate cause of action. *Beaverpark*, citing *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.* (1993), 87 Ohio App.3d 613, 622 N.E.2d 1093. Second, for the promissory-estoppel exception to apply, there must be "either a misrepresentation that the statute of fraud's requirements have been complied with or a promise to make a memorandum of the agreement." *Beaverpark*, citing *McCarthy*, 87 Ohio App.3d at 627, 622 N.E.2d 1093; see also *Landskroner v. Landskroner* 154 Ohio App.3d 471, 2003-Ohio-4945, 797 N.E.2d 1002.

{¶ 41} In the case at bar, appellants have not pointed to any evidence to show that appellee misrepresented that the statute of frauds has been complied with or that appellee promised to make a memorandum of the parties' alleged agreement. Therefore, appellants cannot demonstrate that a genuine issue of material fact remains regarding the promissory-estoppel exception to the statute of frauds.

## B

### PARTIAL PERFORMANCE

{¶ 42} Appellants further contend that the doctrine of part performance removes the statute-of-frauds bar.

{¶ 43} "Ohio courts have consistently recognized the doctrine of part performance as an exception to the statute of frauds." *Beaverpark, supra.* "When applicable, this doctrine operates to remove a contract from the operation of the statute of frauds. In order to remove a contract from the statute of frauds pursuant to the doctrine of part performance, the party that is relying on the agreement must have undertaken 'unequivocal acts * * * which are exclusively referable to the agreement and which have changed his position to his detriment and make it impossible or impractical to place the parties in statu quo.'" Id., quoting *Delfino v. Paul Davies Chevrolet, Inc.* (1965), 2 Ohio St.2d 282, 287, 31 O.O.2d 557, 209 N.E.2d 194. "Thus, a party seeking to establish part performance must demonstrate that he has performed acts in exclusive reliance on the oral contract, and that such acts have changed his position to his prejudice." Id.

{¶ 44} However, "[t]he doctrine of part performance can be invoked, to take a case out of the statute of frauds in Ohio only in cases involving the sale or leasing of real estate, wherein there has been a delivery of possession of the real estate in question, and in settlements made upon consideration of marriage, followed by actual marriage." *Hodges v. Ettinger* (1934), 127 Ohio St. 460, 189 N.E. 113, syllabus; see also *Farmer v. Meigs Ctr.* (Mar. 30, 1998), Meigs App. No. 96 CA 12, 1998 WL 166451; *ID Agency v. Community Mut. Ins. Co.* (July 14, 1994), Cuyahoga App. No. 65298, 1994 WL 372533; *All Star Land Title Agency,* 2006-Ohio-5729, 2006 WL 3095701. Thus, the doctrine does not apply to personal-service contracts. *ID Agency* (implying that contract to sell health insurance is a personal-service contract); *All Star Land Title Agency* (alleged agreement to refer clients to other agency is a personal-service contract); *Sibbring v. Columbus Fin. Planning Agency, Inc.* (Feb. 18, 1982), Franklin App. No. 81AP–26, 1982 WL 3981 (agreement to split insurance commissions was a personal-services contract). In *Hodges,* the court expressly held that the "doctrine of part performance has no place in the law governing contracts for personal services." Id. at syllabus. In doing so, the court limited the second paragraph of the syllabus of *La Bounty v. Brumback* (1933), 126 Ohio St. 96, 184 N.E. 5, which held that partial performance of any contract is effective to take the contract out of the Statute of Frauds. See *Soteriades v. Wendy's of Ft. Wayne, Inc.* (1986), 34 Ohio App.3d 222, 224, 517 N.E.2d 1011.

{¶ 45} In the case sub judice, the subject matter of the alleged contract did not involve the sale or leasing of realty, and it did not involve marriage. The alleged agreement was in the nature of a personal-service contract. Under the alleged agreement, MMO was to provide the service of issuing quotes to SEOVEC and insuring its members. Thus, under *Hodges,* the doctrine of part performance does not remove the alleged agreement from the operation of the statute of frauds.

{¶ 46} Although construing the evidence most strongly in appellants' favor shows that all parties partially performed under some sort of an agreement, *Hodges* prevents application of the part-performance doctrine in this factual setting. Thus, we are unable to conclude that the part-performance doctrine removes the statute-of-frauds bar. We are bound to follow the clear holding of *Hodges*. Appellants, however, could have avoided this result by insisting on an integrated, written contract.

{¶ 47} Accordingly, based upon the foregoing reasons, we overrule appellants' second assignment of error and affirm the trial court's judgment.

Judgment affirmed.

McFARLAND, P.J., and ABELE and KLINE, JJ., concur.