**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0265n.06

No. 12-3432

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 15, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PATTI LEMMON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| RICHARD AYRES, et al., | ) | OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

Before:  SILER, KETHLEDGE, and WHITE, Circuit Judges.

**PER CURIAM.**  Plaintiff-Appellant Patti Lemmon appeals the district court's grant of summary judgment.  The parties have waived oral argument, and we unanimously agree that oral argument is not needed.  Fed. R. App. P. 34(a).  On appeal, Lemmon argues that she stated valid claims for (1) unjust enrichment; (2) promissory estoppel; (3) overtime under the Federal Labor Standards Act ("FLSA"); and (4) FLSA-related state law claims. Because we conclude that Lemmon has established genuine issues of material fact, we REVERSE and REMAND for proceedings consistent with this opinion.

**I.**

Lemmon worked for defendant Richard Ayres from 1998 to 2008.  Her work included accounting tasks, managing a carry-out business that Ayres owned, organizing tax seminars, and

other responsibilities. Between 2003 and 2005, Ayres and Lemmon began a romantic relationship which ended in 2008.

At her deposition, Lemmon testified that she managed Ayres's Subway from October 2005 to October 2008. Lemmon testified that Ayres told her that she would be in charge of managing the Subway and that it would be hers one day, and she testified that she managed the property as if it were her own. Ayres showed Lemmon a section of his will that granted her the Subway property which included a small house. Ayres repeated the promise that the Subway would one day be Lemmon's on more than one occasion. When Lemmon had trouble paying her bills, Ayres suggested that she pay herself out of the Subway account. Lemmon testified that she did not pay herself as Ayres suggested, because she saw the Subway as an investment in her future and did not want to negatively impact the financial health of her investment. Even when Lemmon and Ayres were fighting, Ayres assured Lemmon that "no matter what happens between us, you will still get the Subway."

While working at the Subway, Lemmon did not document any of her time because she did not expect to be paid. Lemmon estimates that she worked approximately 35 hours a week at the Subway from the time the restaurant opened until June or July of 2008, when she decreased her time to 25 hours a week. Lemmon's typical schedule was approximately nine to ten hours each Saturday and Sunday and at least two hours each day during the work week.

Lemmon first asked Ayres for compensation in connection with her work as Subway manager when she realized he wanted to remove her from the position. At this point, she did not believe she would leave Ayres Accounting, but she knew that Ayres intended to remove her as manager of the

Subway. Lemmon testified that she had not asked Ayres for compensation before this time because she saw the Subway as an investment in her future and did not want to ask for money as the restaurant had not yet turned a profit. When Ayres told Lemmon that he planned on hiring new management for the Subway in mid-October, 2008, Lemmon asked for $60,000 in compensation for her three years of work. Ayres denied her request. Lemmon renewed her request once Ayres hired a new manager around November 5, 2008, on November 7, 2008, and on November 13, 2008, but Ayres continued to refuse.

Ayres and Lemmon met on November 12, 2008 to discuss Lemmon's employment. Ayres offered her $4,500 as severance pay, told her he would not dispute her unemployment benefits, and stated that he would write her a letter of recommendation. She rejected his offer and told him that $4,500 for three years of work was a "slap in the face." Lemmon terminated her employment with Ayres Accounting around November 17, 2008.

## II.

Lemmon filed a complaint in an Ohio trial court against Ayres and his company, Ayres Accounting Co., and three unidentified defendants. Defendants removed the case to the United States District Court for the Southern District of Ohio based on federal question jurisdiction. Lemmon alleged that she was not compensated for her work at Subway, that she was promised ownership of the Subway property, and that Ayres committed numerous other misdeeds. She advanced fifteen causes of action, including: unjust enrichment; promissory estoppel; failure to pay overtime wages under the Fair Labor Standards Act ("FLSA"); and failure to pay overtime wages

3

under Ohio law. The district court granted the defendants' motion for summary judgment on all of

Lemmon's claims.

**III.**

**A. Standard of Review**

We review a ruling on a motion for summary judgment de novo, viewing the facts and reasonable inferences drawn therefrom in the nonmovant's favor. *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 476 (6th Cir. 2010). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010). The moving party must demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims," at which point the non-moving party "must present sufficient evidence from which a jury could reasonably find for him." *Jones*, 625 F.3d at 940. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B. Unjust Enrichment**

Lemmon argues that she stated a valid claim for unjust enrichment under Ohio law because she was not fully compensated for managing the Subway. To the extent that she asserts an unconscionability theory for this claim on appeal, she did not raise that argument in her complaint or in response to the defendants' motion for summary judgment. Absent exceptional circumstances that are not present here, she cannot raise it for the first time on appeal. *See Weinberger v. United States*, 268 F.3d 346, 352 (6th Cir. 2001). As to her broader unjust enrichment claim, she must demonstrate that: (1) she conferred a benefit upon the defendants; (2) they had knowledge of that

benefit; and (3) it would be unjust for the defendants to retain the benefit without compensation. *See Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005); *see also FDIC v. Jeff Miller Stables*, 573 F.3d 289, 294–95 (6th Cir. 2009). The benefit to the defendant must be causally related to the substantial detriment of the plaintiff. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003) (citing *Gaier v. Midwestern Group*, 601 N.E.2d 624, 627 (Ohio Ct. App. 1991)). "Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he has conferred upon another, not to compensate him for a loss suffered." *Jones v. Jones*, 903 N.E.2d 329, 337 (Ohio Ct. App. 2008).

The district court concluded that Lemmon did not establish a genuine issue of material fact as to whether there was a causal relationship between Ayres's promise to give Lemmon the Subway and Lemmon's decision to manage the Subway. The district court reasoned that Lemmon chose to manage the Subway for free and was thus responsible for her detrimental position.

Although Ayres argues that Lemmon was compensated for her work at Subway through her salary at Ayres Accounting, yearly bonuses provided by Ayres, retirement benefits, and reduced rent at the house she leased from Ayres, these assertions come entirely from Ayres's deposition testimony—not Lemmon's. Lemmon was not asked about any bonuses she may have received from Ayres or retirement benefits he granted to her. When asked about the reduced rent, Lemmon claimed that Ayres reduced the rent once he realized that she was "getting tight on money." This conflicts with Ayres's testimony that he told Lemmon the reduced rent was compensation for her work at Subway.

Lemmon testified that Ayres suggested that she pay herself from the Subway when she was having problems paying her bills. Viewing this fact in the light most favorable to Lemmon, this suggests that Ayres viewed her position as Subway manager as separate from the job she held at Ayres Accounting and reflects his knowledge that she was not being compensated for her work at Subway. Lemmon's statement that she viewed the Subway as an investment in her future and therefore did not request compensation for her management further supports the inference that Lemmon believed that her ultimate compensation would be the Subway property. Additionally, when viewed in the light most favorable to Lemmon, the fact that she did not ask for compensation until she realized Ayres would not give her the property demonstrates that Lemmon expected <u>some</u> form of compensation for her efforts. Accordingly, we reverse the district court's grant of summary judgment on this claim.

## C. Promissory Estoppel

Lemmon argues that she established a genuine issue of material fact for her promissory estoppel claim. To state such a claim under Ohio law, she must show that: (1) Ayres made a promise in clear, unambiguous terms; (2) she relied on that promise; (3) her reliance was reasonable and foreseeable; and (4) she was injured by the reliance. *See Shampton v. City of Springboro*, 786 N.E.2d 883, 887 (Ohio 2003); *Cohen & Co. v. Messina*, 492 N.E.2d 867, 872 (Ohio Ct. App. 1985). Under Ohio law, agreements for the transfer of land are subject to the statute of frauds and generally must be in writing. *Michel v. Bush*, 765 N.E.2d 911, 914 (Ohio Ct. App. 2001); *see also* Ohio Rev. Code Ann. § 1335.05. However, a plaintiff may still pursue a claim for detrimental-reliance damages under a promissory estoppel theory despite the fact that the statute of frauds bars specific

performance of the oral promise. *Olympic Holding Co. v. ACE Ltd.*, 909 N.E.2d 93, 100–01, 102–03 (Ohio 2009); *cf. ZBS Indus., Inc. v. Anthony Cocca Videoland, Inc.*, 637 N.E.2d 956, 960 (Ohio Ct. App. 1994).

Lemmon has demonstrated that the district court erred in granting summary judgment to the defendants on this claim. Construing the facts in Lemmon's favor as the non-moving party, she has pointed to evidence that Ayres promised her the Subway property; she relied upon that promise; that her reliance was reasonable and foreseeable in light of Ayres's actions; and she made sacrifices because of that promise. The record indicates that Ayres promised to give her the Subway property, recorded that promise in his will, showed that will to Lemmon, repeatedly reassured Lemmon about the promise, and met with a Subway representative to address Lemmon later taking over the franchise. Lemmon also testified that she devoted herself to the Subway because it would one day be hers and that she did not ask for additional compensation specifically because of that promise. Thus, viewing the record in the light most favorable to Lemmon, a genuine issue of material fact exists as to whether she detrimentally relied upon Ayres's promise. The district court does not appear to have considered that possibility. In light of that fact, we vacate the district court's judgment as to this issue and remand for further proceedings. *Cf. Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 155 (Ohio 1985).

**D. FLSA**

Lemmon also argues that she was entitled to overtime wages under the FLSA. The FLSA's requirements do not cover all workers, and the Act excludes coverage of, *inter alia*, certain executive, administrative, and professional workers. *Orton v. Johnny's Lunch Franchise*, 668 F.3d

843, 846 (6th Cir. 2012). In order for an employer to qualify for an exemption from the FLSA's provisions regarding minimum wage, employers must satisfy three tests: "(1) a duties test; (2) a salary-level test; and (3) a salary-basis test." *Id.* To satisfy the salary-basis test, Ayres must show that Lemmon was paid "(1) a predetermined amount, which (2) was not subject to reduction (3) based on quality or quantity of work performed." *Id*. at 847–48 (quoting *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 627 (6th Cir. 2009)) (internal quotation marks omitted). Exemptions to the FLSA's provisions for minimum wage "are to be narrowly construed against the employers seeking to assert them." *Id.* at 847 (quoting *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007)) (internal quotation marks omitted).

Lemmon argues that she was not paid a salary and that the referenced FLSA exemptions do not apply to her. *See, e.g.*, 29 C.F.R. § 541.602. The district court examined two spreadsheets attached to an affidavit by Lemmon, which she asserts are time sheets indicating that she was paid on an hourly basis during 2007 and 2008. The court concluded that the spreadsheets did not create a genuine issue of material fact as to whether Lemmon was paid as an hourly employee.

The spreadsheets appear to cover pay periods beginning in 2007 and ending in 2008, however, the exact months are not legible on the copy in the record. Lemmon's hourly rate of pay is shown at the top of each sheet in a box identified as "Rate." In the seventh column from the left of the sheet, a date range is shown and underneath the range is a number which appears to be the numbers of hours worked by Lemmon. The following column shows a number under "Earnings" that appears to be the gross earnings for that pay period. By multiplying the number of hours worked by the rate of pay, one obtains Lemmon's gross earnings. These numbers largely match for the top

half of the first spreadsheet. It appears that for this period of time, Lemmon was not only paid on an hourly basis, she was not paid time-and-a-half for overtime she accrued. *See* 29 U.S.C. § 207(a)(2).

This changes in the second half of the first spreadsheet. For the first three pay periods in this portion of the time sheet, Lemmon is paid a flat rate of sixteen dollars an hour regardless of any overtime she accrued. However, in the third row, the box where Lemmon's hours typically appear is instead marked "OT Jan Current," and Lemmon receives payment in the amount of $1,088. By adding the overtime Lemmon accrued in the top half of the paysheet and multiplying by Lemmon's time-and-a-half rate ($24/hour), one obtains an amount totaling $1,087.92—close enough to the amount of payment to warrant an inference that this amount was issued as backpay for Lemmon's previously incurred overtime.

From this point forward, the time sheet reveals two columns for each pay period—the first appears to be a flat rate of $1,280 (that is, $16/hour * 80 hours a pay period), with the second column revealing a separate amount equal to the amount of hours Lemmon worked in excess of 80 hours multiplied by $24 (her time-and-a-half rate of pay). This continues until the third row from the bottom, where Lemmon is paid $1,506 for 92.75 hours of work. This is a slight discrepancy from the $1,586 she appears to have been owed for that period ((80 hours * $16) + (12.75 overtime hours * $24)), however the similarity between the number "0" and "8" may account for this error.

This pattern continues on the second spreadsheet submitted by Lemmon. Lemmon appears to have gained a fifty-cent per-hour pay increase during this time period, thereby according her a base pay of $1,320 for each 80 hour pay period. With some discrepancies, it appears that Lemmon was

largely paid overtime during this period. What is clear from this review is that Lemmon was not paid a consistent salaried amount for the dates reflected in these time sheets. Rather, her pay fluctuated as a function of whether or not she worked hours in excess of 40 per week, thereby suggesting that Lemmon was an hourly employee in 2007 and 2008.[1]

Further, on at least two occasions in the time sheet, Lemmon's base salary appears to have fluctuated downward based on the time she recorded. On the last pay period on the first page of the time sheet, Lemmon's base pay is recorded as $1,248, with $30 of overtime added for 79.75 hours of work. In order to obtain Lemmon's base pay for this period, she would have had to have worked 78 hours, thereby suggesting that she worked an additional 1.25 hours of overtime in order to earn the $30 of overtime pay she appears to have received for this time period. However, the 78 hours of base pay combined with the 1.25 hours of overtime yields only 79.25 hours worked—a discrepancy from the 79.75 hours listed on the time sheet. Regardless, this fluctuation in Lemmon's base pay suggests that her pay fluctuated downwards based on the number of hours she worked.

---

[1]We note that Ayres argued before the district court that whether an employee receives additional compensation above her base salary does not establish that she was not compensated on a salary basis, citing *Acs v. Detroit Edison Co.*, 444 F.3d 763, 768 (6th Cir. 2006). (Defs.' Reply Br. Mot. for Summ. J. at 18) In *Acs*, this court held that "additional compensation at the exempt employee's 'hourly' rate for hours worked beyond 40 in a work week[] does not violate the salary-basis test." *Id.* The court's conclusion was based on a provision in 29 C.F.R. § 541.118(b) that "additional compensation besides the salary is not inconsistent with the salary basis of payment." *Id.* (internal quotation marks omitted). Since this court's decision in *Acs*, the Department of Labor updated the regulations defining the salary-basis test. *See Baden-Winterwood*, 566 F.3d at 627. The language this court rested on in *Acs* is no longer present in the updated regulation, thus making our holding in *Acs* distinguishable.

Again, this is repeated on the second spreadsheet. In the fourth pay period reflected on this page of the time sheet, Lemmon's base pay is recorded as $1,295.25 with $49.50 listed as overtime for 80.5 hours worked. At this point, Lemmon's hourly rate had been increased to $16.50/hour. In order to obtain $1,295.25 as base pay for this period, Lemmon would have had to have worked 78.5 hours with an additional two hours of overtime accounting for her overtime pay of $49.50. Again, this suggests that Lemmon's base pay fluctuated downwards from time-to-time depending on the number of hours she worked in a given pay period. Viewing this evidence in the light most favorable to the plaintiff, Lemmon has created a genuine issue of material fact regarding whether she was paid as an hourly or salaried employee.

Further, we note that the district court concluded that Lemmon's FLSA claim regarding her time worked at Subway could not be reasonably adjudicated because Lemmon did not keep a record of the hours she worked at Subway. Although it is true that Lemmon did not keep a written record of the time she worked at Subway, she estimated that she worked approximately 35 hours a week from the time the restaurant opened until the summer of 2008, after which she worked 25 hours a week. She elaborated that her typical schedule was approximately nine to ten hours each Saturday and Sunday and at least two hours each day during the work week. She requested $60,000 as compensation for her work at Subway for the three-year period she served as manager. Even assuming that Lemmon only worked 25 hours a week for this three-year period, it is relatively easy to obtain an hourly calculation for her time (approximately $15.38/hour) based upon the information she has provided. We therefore reverse the district court's ruling that Lemmon did not provide a basis for reasonably adjudicating her pay at Subway. Lastly, because the district court did not reach

12

the merits of Lemmon's related state-law claim for failure to pay overtime, we reverse the district court's grant of summary judgment on this claim as well.

## IV.

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.