*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0349p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RICHARD K. NIEMI, doing business as RICHARD K. NIEMI DESIGN AND ENGINEERING SERVICES; and RKN TECHNOLOGY, L.L.C.,

> *Plaintiffs-Appellants,*

No. 07-3536

*v.*

NHK SPRING CO., LTD.; NHK INTERNATIONAL, LTD.; and NEW MATHER METALS, INC.,

> *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 03-07512—James G. Carr, Chief District Judge.

Argued: July 31, 2008

Decided and Filed: September 19, 2008

Before: DAUGHTREY and McKEAGUE, Circuit Judges; VAN TATENHOVE, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robin H. Kyle, ROBIN H. KYLE, J.D., LL.M., Detroit, Michigan, for Appellants. Patrick F. Hickey, DYKEMA GOSSETT, Detroit, Michigan, for Appellees. **ON BRIEF:** Robin H. Kyle, ROBIN H. KYLE, J.D., LL.M., Detroit, Michigan, Donald E. Schlyer, SCHLYER & ASSOCIATES, Merrillville, Indiana, for Appellants. Patrick F. Hickey, Michael A. Little, DYKEMA GOSSETT, Detroit, Michigan, for Appellees.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Plaintiff Richard K. Niemi devised a new method of manufacturing stabilizer bars for automobiles in 1990, a "trade secret." He alleges he disclosed this method to defendant New Mather Metals, Inc., only after entering into an oral confidentiality agreement. Pursuant to this agreement, New Mather was allowed to use the manufacturing process in exchange for its promise to maintain its secrecy and to grant plaintiff the exclusive right to

_____

[*] The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

perform all design work for New Mather. In 1998, Niemi learned that New Mather had breached the agreement by entering into design contracts with other parties. Niemi brought suit for misappropriation of trade secret, breach of contract, and promissory estoppel. The district court dismissed the claims against New Mather's parent corporation, NHK Spring Co., Ltd., for lack of personal jurisdiction and awarded summary judgment to New Mather on all of Niemi's claims. Niemi has timely appealed these rulings.

On careful consideration of the record, we uphold the district court's dismissal of the claims against NHK Spring Co., but conclude there is sufficient evidence to create genuine issues of material fact on the trade secret and promissory estoppel claims. For the reasons that follow, the summary judgment rulings on these two claims are vacated and the matter remanded for further proceedings.

## I. FACTUAL BACKGROUND

Despite having little more than a high school education, plaintiff Richard K. Niemi has, since the 1960s, made a living in the engineering design business in the metropolitan Detroit area. Although his employment situation has been subject to numerous changes over the years, his involvement in the "bender business," i.e., creating machines and tools to manufacture stabilizer bars for automobiles, has been a constant, as he has serviced customers like New Mather Metals, Inc. of Toledo, Ohio (defendant herein), General Motors Corporation, and Chrysler Corporation. Niemi performed engineering design work for New Mather from 1967 to 1998. During this period, Niemi conducted his business operations informally; apart from quotations, purchase orders and invoices, written documentation was rarely used. During the early 1990s, when the transactions giving rise to this action took place, Niemi operated under the name "Richard K. Niemi Design and Engineering," as a sole proprietorship. Since 1997, Niemi has conducted business, as "50/50 partners" with his son Mark, under the name "RKN Technology, LLC." RKN Technology operates out of Mark's home in South Lyon, Oakland County, Michigan.

In 1990, Niemi approached Denzil Sheckler, of New Mather, to discuss a new method of manufacturing stabilizer bars for automobiles. New Mather was interested in the new method and, in September 1990, issued the first purchase order requesting Niemi to incorporate the new method design into the manufacturing tooling. Although the purchase order was accompanied by a statement of standard terms and conditions providing that "no other or different terms or conditions shall apply to this order unless specifically agreed to in writing by the authorized officer of Purchaser," Niemi contends he obtained New Mather's assurance that the new method "would remain confidential" even before he disclosed it. Niemi aff. ¶ 3, JA 37. He did not reduce this "confidentiality agreement" to writing in the form of a license because he trusted New Mather as "honorable people of integrity I've dealt with for thirty years." Niemi dep. at 238-39, JA 98.

Thereafter, in 1993 or '94, Niemi remembers that Albert Blackwood, New Mather's Engineering Manager, approached him with a request that he sign a reciprocal "exclusivity agreement." Blackwood explained that New Mather, cognizant of the competitive advantage it had gained by using the new bar-forming method, wanted to ensure that its use remained exclusive and that Niemi would not disclose the method to other manufacturers. In exchange for this restriction, Niemi sought assurance that he would continue to receive all of New Mather's design work, as he had for the previous 25 or 30 years, as well as the opportunity to bid on design needs of New Mather's parent corporation, NHK Spring Co., Ltd. After receiving the requested assurance from Blackwood, Niemi signed the exclusivity agreement, but was not given a copy.[1] Although New Mather's reciprocal assurance was not reduced to writing, Niemi believed that he and Blackwood

---

[1]No copy of this exclusivity agreement was ever produced in discovery or made a part of the record.

both understood that New Mather was obligated to continue using Niemi for its design needs perpetually as long as Niemi maintained the confidentiality of the design. No further writing was needed, in Niemi's estimation, because New Mather's obligation represented a continuation of an arrangement that had been in place for 25 or 30 years, an arrangement with people who Niemi had come to believe were honest and trustworthy.[2]

In 1998, Niemi learned of reason to believe New Mather had disclosed his trade secret to, and ordered design work from, other designers, actions which he believed were in violation of the parties' reciprocal exclusivity agreement. Niemi confronted Blackwood and New Mather's President, Ron Malcolm. He learned that Raul Cornieles was the new Engineering Manager. When he confronted Cornieles, Cornieles said he was unaware of any agreement, but would look into it. In his next conversation with Mark Niemi, Cornieles asked whether RKN Technology wanted to be New Mather's design source. Mark Niemi responded affirmatively and "assumed" that Cornieles was thereby ratifying and reaffirming the preexisting mutual exclusivity agreement. Yet, apparently, New Mather did not live up to Niemi's understanding of the exclusivity agreement and Niemi commenced this action.

## II. PROCEDURAL HISTORY

Niemi filed suit in the Eastern District of Michigan on February 28, 2002, invoking federal jurisdiction based on the parties' diversity of citizenship. Named plaintiffs include Niemi, d/b/a Richard K. Niemi Design and Engineering Services, and RKN Technology, LLC (referred to collectively as "Niemi"). Named defendants include New Mather, its parent corporation NHK Spring Co., Ltd. (a Japan corporation), and another subsidiary of NHK Spring, NHK International Ltd. (a Delaware corporation). The original complaint included two counts, asserting claims for misappropriation of trade secret and breach of contract. On August 8, 2003, the district court, Honorable John Feikens, ruled on NHK Spring's motion to dismiss for lack of personal jurisdiction. The court concluded that personal jurisdiction over NHK Spring was lacking. Rather than dismissing the claims against NHK Spring, however, the district court transferred the case to the Northern District of Ohio, where the actions giving rise to Niemi's claims took place.

On transfer of the case to the Northern District of Ohio, NHK Spring again moved to dismiss for lack of personal jurisdiction on November 21, 2003. The district court, Honorable James G. Carr, Chief Judge, granted the motion on April 12, 2006.[3] In the meantime, the district court had on September 2, 2005, granted New Mather's motion for summary judgment on the misappropriation of trade secret claim, but allowed the breach of contract claim to proceed and allowed Niemi to amend the complaint so as to add a promissory estoppel claim. After a further period of discovery on the remaining claims, New Mather filed a second motion for summary judgment on December 1, 2006. The district court granted the motion on March 23, 2007, awarding judgment to New Mather on the breach of contract and promissory estoppel claims and, to the extent Niemi tried to advance a claim for *quantum meruit* relief in his briefing, dismissed the claim as untimely. On appeal, Niemi challenges the dismissal of NHK Spring, the summary judgment rulings on the trade secret and promissory estoppel claims, and the summary dismissal of his *quantum meruit* theory.[4]

---

[2]Blackwood testified that he is unaware of any agreement between New Mather and Niemi restricting New Mather's use of Niemi's drawings or obligating New Mather to send all of its design needs exclusively to Niemi. It was Blackwood's understanding, however, that Niemi had been New Mather's "primary, if not exclusive designer."

[3]Plaintiffs had voluntarily dismissed the claims against NHK International on September 22, 2005.

[4]The district court's ruling that Niemi's breach of contract claim is barred by the statute of frauds is not challenged on appeal.

## III. ANALYSIS

In challenging the district court's summary judgment rulings, Niemi contends the court failed to view the entire the record in the light most favorable to him and insists that he presented sufficient evidence to create genuine issues of material fact on both his trade secret and promissory estoppel claims. The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2005). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id.*

### A. Misappropriation of Trade Secret

There is no dispute between the parties as to the legal standards governing Niemi's claim for misappropriation of his trade secret, set forth in Count I of the first amended complaint. The viability of the claim depends fundamentally on whether Niemi's stabilizer bar manufacturing method is a "trade secret." Under Ohio law, "trade secret" is defined as follows:

> (D) "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio R.C. § 1333.61. Focusing on the last element in this definition, the district court held that Niemi had presented "no evidence of affirmative acts . . . to maintain the secrecy of the designs."[5] The court held that Niemi's allegation of an oral confidentiality agreement between himself and New Mather was "entirely unsupported." Niemi objects to this characterization of the record and points to several items which he insists give rise to genuine issues of material fact.

First, Niemi contends the district court totally ignored his affidavit, in which he details the measures he took to safeguard the secrecy of his trade secret. Specifically, Niemi states that he maintained complete control over his drawings and blueprints for the new manufacturing process in a secret, locked location in his house. Niemi aff. at ¶¶ 2-4, JA 36. He did not disclose them to anyone other than his son and partner Mark Niemi, and agents of New Mather—and to them only after receiving assurances of confidentiality. *Id.* at ¶ 3. When drawings were transported to and

---

[5]New Mather has not contested the assertion that Niemi's method derived independent economic value from not being generally known and not being readily ascertainable by others.

from New Mather's place of business in Toledo, they were always personally hand-delivered either by Niemi or his son or by New Mather personnel, who were required to sign for them. *Id*. at ¶ 11. No trade secret information was ever communicated by Niemi via electronic media. *Id*. at ¶ 12. In addition, Niemi was well aware of the security measures consistently employed by New Mather at its facility. *Id*. at ¶¶ 5-10.

New Mather contends the affidavit is entitled to little weight, arguing it was manufactured in response to the motion for summary judgment. New Mather has not, however, otherwise refuted the contents of the affidavit. Granted, apart from Niemi's affidavit statement that he received assurances of confidential treatment before he disclosed the method to Sheckler, there appears to be no evidence of a confidentiality agreement. Still, Niemi's statement has not been contradicted on the record. Though Sheckler was deposed and expressly acknowledged the manufacturing improvement effected by Niemi's new method, neither side has identified evidence of Sheckler's recollection of the asserted assurance of confidentiality. Blackwood testified that he was unaware of any restriction on New Mather's use of Niemi's drawings, but he did not directly refute the allegation that Niemi was given assurance of confidentiality before disclosing the method to Sheckler. In sum, Niemi's affidavit averment regarding the existence of an oral confidentiality agreement is unrefuted and is not "no evidence."

Second, Niemi relies on his deposition testimony detailing the conversation he had with Blackwood in 1993 or '94, when he remembers signing the exclusivity agreement and Blackwood reportedly assured him that New Mather would continue to direct its design needs to him as long as he maintained the secrecy of his new method. There is otherwise no substantiation of a written exclusivity agreement. Blackwood testified that he is unaware of any such written agreement and he doesn't recall agreeing that Niemi would be New Mather's exclusive designer. However, Blackwood acknowledged that Niemi had been New Mather's "primary, if not exclusive designer." Hence, although Blackwood's testimony does not directly corroborate Niemi's averment that there was an exclusivity agreement, his recollection of the parties' relationship and course of dealing from 1991 to 1997 affords *de facto* corroboration.[6]

Third, in support of the argument that his reliance on New Mather's oral assurances of confidentiality was reasonable, Niemi points to the declarations of three experts. Phillip S. Szuba, Ph.D., P.E. (automotive systems engineer), James R. Childs, Jr. (automotive design supervisor), and Eugene Friedman (patent lawyer), have all stated that it is customary in the automotive industry for small companies such as RKN Technology to rely on oral assurances of confidentiality regarding proprietary information when dealing with large automotive companies.

New Mather has not contested the contents or significance of these declarations, except to argue they are not relevant because Niemi has submitted no evidence of an oral confidentiality agreement. As explained above, Niemi's affidavit, albeit arguably self-serving, is not "no evidence." Given that Niemi's sworn averment of an oral confidentiality agreement is probative evidence and is not refuted, the experts' opinions afford facially significant evidence of the reasonableness of Niemi's reliance on such an oral agreement. Absent such evidence of customary

---

[6] New Mather argues that even if there were an oral reciprocal exclusivity agreement, its enforcement would be barred by the statute of frauds. The argument misperceives the nature of Niemi's misappropriation of trade secret claim. It is not a breach of contract claim. The evidence of the exclusivity agreement is not asserted—in this context—in furtherance of enforcing its specific terms, but as evidence of the reasonableness of Niemi's efforts to secure the secrecy of his trade secret. The protection afforded by trade secret laws is not a function of property interests or contract rights, but of "equitable principles of good faith applicable to confidential relationships." *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 492 N.E.2d 814, 817 (Ohio 1986). Whether the statute of frauds would bar enforcement of the agreement is therefore irrelevant to the question whether the agreement nonetheless evidences a confidential relationship such that unauthorized use of information disclosed in that relationship would be inequitable. The statute of frauds defense plays a more significant role, however, in relation to the promissory estoppel claim, discussed below.

practice in the industry, reliance on an oral promise could well be deemed not to represent a "reasonable effort" to maintain secrecy. Yet, when Niemi's statement is viewed in the light of this customary practice and the parties' 25-to-30 year relationship, a genuine issue of material fact begins to emerge.

Fourth, relying on his own deposition testimony and that of Denzil Sheckler, Niemi contends that he created standardized drawings of standardized manufacturing machine parts. This enabled New Mather to order the fabrication of different tools by different manufacturing or "build" shops without needing to disclose the complete set of prints to any one shop, thereby preserving the secrecy of the trade secret method.

New Mather has not identified any record evidence refuting this testimony. Instead, New Mather proposes a different view of the evidence. New Mather contends that Niemi's knowledge of New Mather's disclosure of his drawings to different shops without requiring that the drawings be labeled "confidential" evidences his carelessness. To this, Niemi responds that his standardization of the drawings, facilitating distribution of tool manufacturing jobs to different shops, obviated the need to label drawings "confidential." He contends that drawings of individual machine part designs alone, unaccompanied by a complete set of drawings, failed to disclose the overall method. Hence, this standardizing technique is said to represent a reasonable and effective effort to preserve secrecy even without labeling the individual drawings "confidential."

At oral argument, however, counsel for New Mather interjected a new argument—again without record support—contending that a complete set of the drawings was disclosed, with Niemi's knowledge and without being labeled "confidential," to at least two design shops. Counsel for Niemi quickly responded that any such disclosure would have been in direct breach of the parties' confidentiality agreement. In our opinion, it suffices at this stage to observe that the parties' positions, though finding disappointingly little support in the record, are conflicting and irreconcilable. Their dispute substantiates the existence of a genuine fact issue.[7]

In further support of his argument that summary judgment was premature, Niemi relies heavily on *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714 (7th Cir. 2003). *Learning Curve* teaches simply that whether efforts taken to maintain the secrecy of a trade secret are reasonable under the circumstances depends on the circumstances; that what is reasonable for a small company may be different from what is reasonable for a large company; and that the determination ordinarily represents a question for the jury. *Id*. at 724-25. The court observed that "only in an extreme case can what is a 'reasonable' precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Id*. at 725 (quoting *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) (internal brackets omitted).

In *Learning Curve*, the Seventh Circuit upheld a jury verdict for the smaller company, PlayWood, on its misappropriation of trade secret claim, thereby reversing the trial court's contrary judgment as a matter of law. The court upheld the jury's verdict based on evidence of an oral confidentiality agreement, coupled with evidence that oral confidentiality agreements were customarily relied on. *Id*. at 725-26. The court readily acknowledged that PlayWood could and should have done more to protect its secret, but concluded the evidence was sufficient for the jury to determine that PlayWood, the smaller and less sophisticated of the parties, took reasonable precautions under the circumstances. *Id*.

---

[7]New Mather contends this fact issue is not material, because under *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 492 N.E.2d 814 (Ohio 1986), Niemi's standardization of drawings is not recognized as a reasonable effort to maintain secrecy. For the reasons set forth below in our discussion of *Valco*, we disagree.

New Mather contends first that *Learning Curve* does not apply Ohio law and is therefore not controlling. Yet, both the Illinois and Ohio versions of the Uniform Trade Secrets Act include the same definition of "trade secret." Further, the Ohio Revised Code expressly provides that its trade secrets provisions "shall be applied and construed to effectuate their general purpose and to make uniform the law with respect to their subject." Ohio R.C. § 1333.68. It follows that the *Learning Curve* analysis, though certainly not controlling, is probative.

New Mather's attempt to factually distinguish *Learning Curve* also falls short. New Mather contends that the *Learning Curve* jury's verdict was based in part on evidence (1) of a written confidentiality agreement, and (2) that PlayWood stamped documents "confidential." A careful reading of *Learning Curve* reveals, however, that this evidence pertained to PlayWood's efforts, in its dealings with its own manufacturer, to protect the confidentiality of materials it had received from Learning Curve. *Learning Curve*, 342 F.3d at 719. The evidence did not pertain to efforts taken by PlayWood to protect the trade secret disclosed to and misappropriated by Learning Curve. The pertinent analysis in *Learning Curve* includes neither reference to nor reliance on any such evidence in its recapitulation of the evidence deemed sufficient to support the jury's verdict. *Id*. at 725-26. In truth, the operative facts in *Learning Curve*, consisting essentially of an oral confidentiality agreement and evidence of customary usage in the industry, are very similar to the instant facts.

Neither has New Mather identified any Ohio authority suggesting that *Learning Curve* is contrary to or inconsistent with Ohio law. Ohio law recognizes that a party claiming trade secret status has the burden of demonstrating that it took reasonable steps to maintain the secrecy of the protected information. *State ex rel. Carr v. Akron*, 859 N.E.2d 948, 955 (Ohio 2006); *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 492 N.E.2d 814, 819 (Ohio 1986). New Mather argues that *Valco* presents an example of the kinds of reasonable efforts that are required to make out a valid claim under Ohio law and contends that Niemi's efforts do not measure up.

In *Valco*, the court upheld the trial court's issuance of an injunction, holding that the security measures undertaken by Valco at its manufacturing plant and in relation to its drawings were sufficient (notwithstanding Valco's failure to obtain a non-disclosure agreement from the misappropriating employee) to create a question for the trier of fact, the resolution of which was entitled to deference by the reviewing court. *Id*. Yet, while the efforts taken by Valco were deemed sufficient to create a triable fact issue, the Ohio Supreme Court's opinion cannot be read as establishing a mandatory minimum standard below which any efforts taken are necessarily deemed insufficient or unreasonable as a matter of law. The instant record indicates that some of the measures identified in *Valco* were used and some were not. On the other hand, the record also evidences measures taken in this case that were not employed in *Valco*, e.g., a pre-disclosure confidentiality agreement between the parties.

Yet, our task is not to compare and contrast the quantum and quality of reasonable efforts taken in the two cases to determine which set of facts is superior. The question before us is whether the instant record, viewed in the light most favorable Niemi, contains sufficient evidence to enable a reasonable fact finder to conclude that Niemi took reasonable steps to safeguard the secrecy of his method, such that New Mather's alleged unauthorized use of the information could be deemed a breach of good faith in the parties' confidential relationship. *Valco*, 492 N.E.2d at 817. And on this question, *Valco*, like *Learning Curve*, honors the fact finder's prerogative to determine reasonableness.

New Mather also cites *Hoffman-La Roche Inc. v. Yoder*, 950 F. Supp. 1348 (S.D. Ohio 1997). In *Hoffman-La Roche*, the district court denied injunctive relief, finding that controverted evidence of a confidentiality agreement and other reasonable efforts was insufficient to sustain the plaintiff's burden. In some respects, the factual record presented in *Hoffman-La Roche* is analogous

to the instant record.  However, the *Hoffman-La Roche* court premised its award of judgment to the defendant on detailed fact findings only *after* conducting a full-blown trial, making credibility determinations, and carefully weighing the evidence.  The plaintiff in *Hoffman-La Roche* thus received precisely what Niemi wants:  his day in court.  Although Niemi's showing of reasonable efforts, on paper, may appear to be no stronger than that described in *Hoffman-La Roche*, it is nonetheless sufficient to win for Niemi what Hoffman-La Roche was granted, the opportunity to tell his story in a trial.

In *R & R Plastics, Inc. v. F.E. Myers Co.*, 637 N.E.2d 332 (Ohio App. 6 Dist. 1993), we find an example of an Ohio court ruling against a trade secret claimant as a matter of law.  The *R & R Plastics* court upheld summary judgment for the defendant where there was "no evidence" of a confidentiality agreement, express or implied, and "no evidence" of "effective security measures." *Id*. at 341-43.  In other words, the record contained so little evidence supporting the plaintiff's claim that "reasonable minds [could] only conclude" that the defendant was entitled to judgment as a matter of law.  *Id*. at 342-43.  *R & R Plastics* represents what *Learning Curve* characterized as the "extreme case," where the evidence of reasonable efforts is so utterly lacking in substance as to warrant judgment as a matter of  law.  In our opinion, for all the reasons set forth above, Niemi's showing of reasonable efforts is not such an "extreme case."  It is not as weak as the showing made in *R & R Plastics*.  Contrary to the lower court's characterization, Niemi's showing is not "no evidence."

In sum, then, we conclude that the teaching of *Learning Curve* is entirely consistent with Ohio law.  The lesson is that, except where the evidentiary showing of reasonable efforts could not conceivably support a judgment in favor of the plaintiff, the reasonableness of the efforts is a question for the trier of fact.  Because, depending on the credibility of the witnesses, it is conceivable, based on the present record, that a reasonable jury could find that Niemi's efforts to maintain the secrecy of his trade secret were reasonable, in light of his long term relationship with New Mather and the relative sophistication of the parties, we conclude that the district court's summary judgment ruling on the claim for misappropriation of trade secret was in error.

### B. Promissory Estoppel

In Count III of the first amended complaint, Niemi asserts a promissory estoppel claim based on the alleged exclusivity agreement.  Under Ohio law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Shampton v. City of Springfield*, 786 N.E.2d 883, 887 (Ohio 2003) (quoting Restatement 2d, Contracts (1981), Section 90).  To prevail on his promissory estoppel claim, Niemi must show that he reasonably relied on New Mather's representations in such a way as to change his position for the worse.  *Id*.  The district court rejected New Mather's statute of frauds defense, finding Ohio law unsettled, but awarded summary judgment to New Mather on the ground that Niemi's reliance was not shown to be reasonable.

### 1. *Statute of Frauds*

The statute of frauds provides in relevant part:

> No action shall be brought whereby to charge the defendant . . . upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

Ohio R.C. § 1335.05. The exclusivity agreement asserted by Niemi appears to have been indefinite in duration and there is no evidence that it was ever reduced to writing. Yet the district court refused to apply the statute of frauds to bar the claim because Ohio courts have sometimes allowed promissory estoppel claims to proceed in avoidance of the statute of frauds.

Indeed, Ohio law is unsettled on the application of the statute of frauds to a promissory estoppel claim. In *McCarthy, Lebit, Crystal & Haiman Co., LPA v. First Union Mgmt., Inc.*, 622 N.E.2d 1093, 1102 (Ohio App. 8 Dist. 1993), the Eighth District Court of Appeals purported to adopt a rule restricting the extent to which promissory estoppel could be used to avoid the statute of frauds. Under its formulation, "the doctrine of promissory estoppel may be used to preclude a defense of statute of frauds, but only when there has been (1) a misrepresentation that the statute's requirements have been complied with or (2) a promise to make a memorandum of the agreement." *Id*. at 1102. This rule has been followed in *Spectrum Benefit Options, Inc. v. Medical Mutual of Ohio*, 880 N.E.2d 926, 937 (Ohio App. 4 Dist. 2007), and *Landskroner v. Landskroner*, 797 N.E.2d 1002, 1016 (Ohio App. 8 Dist. 2003). If the teaching of *McCarthy* were followed in this case, the statute of frauds would operate to bar Niemi's promissory estoppel claim. Despite the bald allegation in the first amended complaint of "representations regarding execution of a written agreement which would meet the requirements of the law," Niemi has not identified any representation by Blackwood or anyone else to the effect that the alleged reciprocal exclusivity agreement was or would be reduced to writing.

However, the Ohio courts have not been uniform in their approach to the interplay of promissory estoppel and the statute of frauds. *See Heffner Investments, Ltd. v. Piper*, 2008 WL 2168781 at *4-5 (Ohio App. 3 Dist.) (recognizing conflict among courts of appeals decisions, but refraining from reaching issue); *Martin v. Friedberg*, 2007 WL 2206019 at *3 (Ohio App. 5 Dist.) (acknowledging *McCarthy*, but concluding that defendant was nonetheless estopped from asserting statute of frauds defense); *ESKE Properties, Inc. v. Sucher*, 2003 WL 22880782 at *13 (Ohio App. 2 Dist.) (implying that continued vitality of *McCarthy* is in doubt); *Connolly v. Malkamaki*, 2002 WL 31813040 at *4-5 (Ohio App. 11 Dist.) (refusing to apply *McCarthy* limitations due to patent unfairness to unsophisticated plaintiff); *Poskocil v. Cleveland Inst. of Music*, 1997 WL 209265 at *3-4 (Ohio App. 8 Dist.) (holding *McCarthy* limitations inapplicable to employer-employee relationships due to unequal bargaining positions and resultant injustice). Despite this apparent inconsistency, the Ohio Supreme Court has not had occasion to clarify the matter.

Given this uncertainty in Ohio law, and recognizing that "Niemi was relatively less sophisticated than Mather," the district court refused to enforce the statute of frauds to bar the promissory estoppel claim. In this we find no error. Ultimately, all of the Ohio appellate decisions, irrespective of their particular construction of the promissory-estoppel exception to the statute of frauds, may be viewed as turning on the specific equities of the claims and parties at issue. Indeed, *McCarthy* itself recognizes that both the statute of frauds and the doctrine of promissory estoppel are designed to prevent fraud and that "the statute of frauds may not be interposed in furtherance of fraud." *McCarthy*, 622 N.E.2d at 1100. The willingness of the Ohio courts to enforce the statute of frauds in the face of a promissory estoppel claim thus appears to depend fundamentally on consideration of the totality of the circumstances.

Considering the totality of the present circumstances, we conclude that the equities favor the result reached by the district court. Niemi was less sophisticated than his bargaining partner. His belief that a reciprocal exclusivity agreement had been reached was based on oral representations by a representative of New Mather whom he had come to trust during a long-term course of dealing. In reliance on the parties' agreement, Niemi assertedly refrained from pursuing other business opportunities that would otherwise have been available to him. Further, New Mather undoubtedly benefitted from Niemi's having granted it exclusive permission to use the stabilizer bar manufacturing method. Considering these circumstances and the relative equities of the parties, we

find no error in the district court's rejection of the statute of frauds in defense of the promissory estoppel claim.

### 2. *Reasonable Reliance?*

Upon addressing the merits of the claim, the district court concluded, however, that Niemi had failed to demonstrate reasonable reliance. This conclusion is based largely on Niemi's supposed admission that Blackwood lacked authority to bind New Mather. If Niemi knew that a mid-management-level employee like Blackwood lacked authority to enter into the exclusivity agreement on behalf of New Mather, the district court reasoned, then Niemi's reliance on Blackwood's oral representation could not have been reasonable. Niemi contends the district court ignored his argument that his reliance on Blackwood's *apparent* authority was reasonable and ignored other evidence corroborating the reasonableness of his reliance, such as Blackwood's acknowledgment that Niemi had in fact been New Mather's exclusive designer and Cornieles's recognition of his exclusive designer status after having been confronted by Niemi with the parties' earlier agreement.

In *Master Consol. Corp. v. BancOhio Nat'l Bank*, 575 N.E.2d 817 (Ohio 1991), the contours of the apparent authority doctrine are defined as follows:

> "Apparent authority" has been defined as ". . . the power to affect the legal relations of another person by transactions with third persons . . . arising from . . . the other's manifestations to such third persons." 1 Restatement of the Law 2d, Agency (1958) 30, Section 8. This court, in *Miller v. Wick Blg. Co.*, 154 Ohio St. 93, 93 N.E.2d 467 (1950), paragraph two of the syllabus, held that:

> "Even where one assuming to act as agent for a party in the making of a contract has no actual authority to so act, such party will be bound by the contract if such party has by his words or conduct, reasonably interpreted, caused the other party to the contract to believe that the one assuming to act as agent had the necessary authority to make the contract." See also, *Cascioli v. Central Mut. Ins. Co.*, 4 Ohio St. 3d 179, 181, 448 N.E.2d 126, 128 (1983).

> Further, this court in *General Cartage & Storage Co. v. Cox*, 74 Ohio St. 284, 294, 78 N.E. 371, 372 (1906), explained that, "'[w]here a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform on behalf of his principal a particular act, such particular act having been performed the principal is estopped as against such innocent third person from denying the agent's authority to perform it.' . . ."

*Id*. at 822.

Applying these standards, we hold there is a question of fact as to the reasonableness of Niemi's reliance on Blackwood's apparent authority, based on:

(1) Blackwood's representation that his principal, New Mather, to maintain its competitive edge, wanted to "tie Niemi up" through the exclusivity agreement;

(2) Niemi's extensive dealings with New Mather through its agent Blackwood, who served New Mather in a variety of capacities and ostensibly enjoyed his superiors' favor;

(3) Niemi's understanding that the exclusivity agreement was merely a perpetuation of a relationship that had been in existence since 1967;

(4) Blackwood's corroboration that Niemi had in fact been New Mather's primary, if not exclusive, designer;

(5) Niemi's familiarity with New Mather over a 25-30 year course of dealing, in which he had come to view New Mather as an honorable and trustworthy business partner;

(6) record evidence that oral agreements are a matter of customary usage in the automotive industry; and

(7) Cornieles's "ratification" or renewal of the exclusivity agreement in 1998 after Niemi brought it to his attention and Cornieles had a chance to confer with his superiors.

In concluding there is no question of fact, the district court did not consider Blackwood's apparent authority or the significance of the above considerations under the teaching of *Master*. New Mather has not effectively refuted these facts. New Mather argues about the significance of some of the above considerations, but fails to demonstrate that, considering the totality of the circumstances in the light most favorable to Niemi, no reasonable jury could find for Niemi on the question of Blackwood's apparent authority. If Blackwood were shown to have had apparent authority, the basis for the district court's holding that Niemi's reliance was not reasonable would be undercut. Niemi's factual showing may not be compelling, or even strong, but it is more than a mere scintilla of evidence. The promissory estoppel claim, like the misappropriation of trade secret claim, presents questions that simply call for live testimony and an opportunity for the fact finder to see and hear the witnesses and assess their credibility. The summary judgment ruling on the promissory estoppel claim is therefore vacated as well.

### C. *Quantum Meruit* Relief

The first amended complaint does not include a claim for *quantum meruit* relief. In response to New Mather's motion for summary judgment, however, Niemi argued that the record evidence substantiated his entitlement to *quantum meruit* relief based on a quasi-contract, or contract-implied-at-law, theory. As no such claim had been pleaded, the district court correctly treated Niemi's argument as an implicit motion to amend the complaint. *See Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir. 1999). The court examined the elements of such a *quantum meruit* theory and concluded that permitting the "eleventh hour" amendment (i.e., after the court had just concluded the properly pleaded claims were meritless) would result in unfair prejudice to New Mather. In particular, the court noted that discovery had been limited to liability issues and had not included matters of damages which are integral to a *quantum meruit* theory of relief.

Under Fed. R. Civ. P. 15(a)(2), leave to amend is to be freely given when justice so requires. The district court's decision to disallow amendment is reviewed for abuse of discretion. *Super Sulky*, 174 F.3d at 740. Considering the context in which the district court ruled, it cannot be said to have abused its discretion in denying the implied motion for leave to amend. Given our remand of the case for further proceedings on the trade secret and promissory estoppel claims, however, the discretionary equation changes dramatically. Remand will almost certainly entail a re-opening of discovery on damages, which *may* legitimize Niemi's prospective request for leave to assert a claim for *quantum meruit* relief without causing unfair prejudice to New Mather. This is particularly true in connection with continued proceedings on the promissory estoppel claim, the elements of which are analogous to the elements of a claim for *quantum meruit* relief based on a quasi-contract theory. *Compare Anderson, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir. 2003) (defining elements of promissory estoppel under Ohio law as including a promise, reasonable reliance, and resulting injury under circumstances where injustice can be avoided only by enforcing the promise), and *Reisenfeld & Co. v. Network Group, Inc.*, 277 F.3d 856, 860 (6th Cir. 2002) (defining elements of quasi-contract claim under Ohio law as "(1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."). In addition, continued proceedings on the trade secret claim, which also implicates "equitable principles of good faith in confidential relationships," *Valco*, 492 N.E.2d at 817, might also justify reconsideration of a prospective *quantum meruit* claim.

Accordingly, though the district court did not abuse its discretion when it denied Niemi's implied motion for leave to amend the complaint so as to state a claim for *quantum meruit* relief, if Niemi were to renew his motion on remand, the district court may entertain it afresh.

### D. Personal Jurisdiction over NHK Spring

Finally, Niemi challenges the district court's dismissal of his claims against New Mather's parent corporation, NHK Spring, for lack of personal jurisdiction. The district court noted that although Niemi presented evidence of NHK Spring's interactions with its subsidiary New Mather in Ohio, Niemi failed to show that such actions by NHK Spring caused tortious injury to Niemi. In challenging this ruling, Niemi argues first that the district court was precluded, pursuant to the law-of-the-case doctrine, from revisiting an issue already decided by the District Court for the Eastern District of Michigan before the case was transferred to the Northern District of Ohio.

Under the law-of-the-case doctrine, rulings made at one point in the litigation should continue to govern in subsequent stages of that litigation. *Scott v. Churchill*, 377 F.3d 565, 569 (6th Cir. 2004); *Rouse v. DaimlerChrysler Corp. UAW*, 300 F.3d 711, 715 (6th Cir. 2002). The doctrine merely directs the court's discretion; it does not limit the court's power. *Scott*, 377 F.3d at 569. The doctrine has no application where the issue in question was not previously decided. *United States v. Graham*, 327 F.3d 460, 464 (6th Cir. 2003).

When Judge Feikens, in the Eastern District of Michigan, transferred the case, he was ruling on a motion to dismiss by NHK Spring, contending that it was not amenable to suit *in Michigan*. Judge Feikens agreed, holding that Niemi had not shown that the cause of action arises out NHK Spring's contacts in Michigan. Judge Feikens did not purport to rule that NHK Spring is amenable to suit in Ohio. Rather, the case was transferred to the Northern District of Ohio because it was undisputed that New Mather is located in Toledo and that NHK Spring's interactions with New Mather, whether or not sufficient to support exercise of personal jurisdiction in Ohio, occurred in Ohio. Because Judge Feikens was not asked to, and did not, in fact, rule on the sufficiency of NHK Spring's contacts in the State of Ohio, Chief Judge Carr was not constrained by any such ruling after the case was transferred.

In ruling on NHK Spring's new motion to dismiss the claims against it, however, Chief Judge Carr did hold that Judge Feikens's ruling was, in one respect, controlling as the law of the case. That is, Chief Judge Carr acknowledged Judge Feikens's holding that New Mather was not an alter ego of NHK Spring.[8] Consequently, Niemi had the burden to show that NHK Spring was subject to the court's exercise of personal jurisdiction in Ohio based on its own conduct in Ohio, rather than New Mather's. The court concluded that Niemi had not carried this burden because he failed to demonstrate that NHK Spring's conduct in Ohio caused him tortious injury, as required by Ohio R. C. § 2307.382(A). The court held that Niemi's evidence of a causal connection between NHK Spring's conduct and his claims was too speculative.

Niemi has not shown that this ruling was in error. His perfunctory argument is effectively undermined by one of the very cases he relies on, *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269 (6th Cir. 1998). In *Dean*, the court recognized that a company does not purposefully avail itself of the privilege of doing business in the forum state merely by owning a corporation subject to jurisdiction. *Id.* at 1273-74. Further, like the plaintiff in *Dean*, Niemi has failed to show, despite extensive discovery, that NHK Spring, through a network of simultaneous board memberships or otherwise, actually controlled New Mather or controlled the decisions and actions made by New Mather that resulted in Niemi's alleged injuries. *Id.* at 1274-75. Though the "evidence" adduced

---

[8]This holding has not been challenged by Niemi.

by Niemi is to be viewed in the light most favorable to him, here, as in *Dean*, the evidence is simply too amorphous and speculative to justify stretching the long arm of personal jurisdiction across national borders to reach a Japanese corporation. *See id*. at 1275.

Accordingly, the district court's dismissal of NHK Spring from the action for lack of personal jurisdiction was proper.

## IV. CONCLUSION

In sum, for the reasons set forth above, the district court's order dismissing the action against NHK Spring is **AFFIRMED**, but the summary judgment rulings in favor of New Mather on Niemi's misappropriation of trade secret and promissory estoppel claims are **VACATED**, and the case is **REMANDED** for further proceedings on these two claims.