NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0658n.06

Nos. 10-6349, 10-6430

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**_Jun 21, 2012_**

LEONARD GREEN, Clerk

SAE BIANG OPTICAL and SUK JAE LEE,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiffs-Appellants/Cross-Appellees,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
KENMARK OPTICAL, INC.,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendant-Appellee/Cross-Appellant.⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
WESTERN DISTRICT OF
KENTUCKY

O P I N I O N

BEFORE: BATCHELDER, Chief Judge; McKEAGUE, Circuit Judge; and QUIST, Senior District Judge.[*]

**McKEAGUE, Circuit Judge.** Kenmark Optical, Inc., entered into an agreement to purchase 225,000 units of magnetic clip-on eyewear products from Sae Biang Optical during a three-year period. Before Kenmark even received any of the first units ordered, it was named as defendant in a patent infringement suit. Kenmark thereupon agreed to cease marketing the Sae Biang products and repudiated its contract with Sae Biang. Sae Biang sued for breach of contract. The district court held that Kenmark's repudiation was not justified, but awarded damages in an amount far less than Sae Biang sought. Both sides have appealed. On due consideration, we reject both sides' appellate arguments and affirm the judgment of the district court.

---

[*]The Honorable Gordon J. Quist, United States Senior District Judge for the Western District of Michigan, sitting by designation.

## I.  BACKGROUND

Sae Biang Optical, a South Korean corporation, is a manufacturer and exporter of eyewear products.  Sae Biang is managed by its President, Suk Jae Lee, also a citizen of South Korea.  Kenmark Optical, a Kentucky corporation, is a manufacturer and marketer of optical products.  In or about 2000, Sae Biang developed magnetic clip-on eyewear products said to be thinner and lighter than the then-available designs.  It applied for patent protection in various countries, including the United States.  In January and February 2001, Sae Biang and Kenmark entered into two contracts, known as the License Agreement and Distribution License Agreement.  Pursuant to the contracts, Kenmark agreed to purchase products manufactured by Sae Biang that were the subject of its pending patent applications (optical frames, sunglasses and related products).  In turn, Sae Biang granted Kenmark an exclusive license to distribute the eyewear products in the United States.

The contracts expressly acknowledged Kenmark's responsibility to obtain independent legal advice in relation to Sae Biang's pending patent and acknowledged the likelihood of "malicious or nuisance" patent-infringement suits by third parties.  Sae Biang expressly declined to indemnify Kenmark for expenses incurred in defending against such claims.  The contracts gave Kenmark the right to terminate in the event Kenmark "loses" a suit brought against it for infringement of an eyewear patent owned by a third party.

Before entering into the agreements, Kenmark retained patent counsel for an opinion as to whether Sae Biang's products infringed any existing U.S. patents.  The attorney examined the Sae

Biang products in light of several existing patents and found no infringement. Kenmark agreed to purchase not less than 225,000 units of eyewear products from Sae Biang during the three-year term of the contracts. The contracts did not specify a price for the products, but the parties agreed to a price of $13 per unit for the initial order of 57,600 units, to be delivered in three shipments of 19,200 units in 2001. Sae Biang received a $50,000 deposit from Kenmark to secure performance under the contracts.

Before Kenmark received its first delivery from Sae Biang, it displayed samples of the eyewear products at the New York Vision Expo in March 2001 and solicited orders. Immediately—i.e., while the trade show was still in progress—Kenmark was served with a patent infringement complaint filed by Aspex Eyewear, Inc., in the Southern District of New York on March 23, 2001. Aspex claimed to be the exclusive licensee of rights to sell and use products described in U.S. Patent No. 6,109,747 ("the '747 patent"), entitled "Eyeglass Frames with Magnets in Flanges." Kenmark again consulted with its patent attorney, who had not previously examined the '747 patent. He acknowledged that the '747 patent appeared to be valid and that distribution of the Sae Biang products appeared to infringe the '747 patent.

This opinion was incorporated into a letter that Kenmark CEO Mark Kerman signed and sent to Sae Biang on April 16, 2001. The letter stated that because Kenmark's marketing of the Sae Biang eyewear products would constitute patent infringement in violation of law, the parties' contracts were illegal, unenforceable and void. The letter sought refund of Kenmark's $50,000 deposit. Kenmark thus repudiated and terminated the contracts.

Kenmark did not seek assistance, explanation or clarification from Sae Biang. When Sae Biang was informed of the problem, Suk Jae Lee objected, insisting that Sae Biang's products did not infringe the '747 patent and offering assistance. Kenmark remained unpersuaded and paid little heed to Sae Biang's protest. Kerman later explained that Kenmark would have fought the Aspex infringement action if there were any chance of proving non-infringement. Instead, on May 22, 2001, Kenmark acceded to Aspex's demands that it cease marketing and distributing the offending eyewear and the Aspex suit was dismissed.

At the time of repudiation, Sae Biang had manufactured and was ready to deliver the first shipment of 19,200 units, i.e., the "finished goods." The remaining 38,400 units included in Kenmark's first order had been partially completed. These are referred to as the "unfinished goods." The parties had not yet agreed on a price for the additional 167,400 units Kenmark promised to purchase during the term of the contracts. These are called the "future orders."

Sae Biang filed suit for breach of contract in the Southern District of New York on July 22, 2004 and the case was later transferred to the Western District of Kentucky. Sae Biang's amended complaint sets forth three causes of action, but the only claim at issue in this appeal is the first, for damages caused by Kenmark's breach of promise to purchase 225,000 units. Ruling on cross-motions for summary judgment on January 17, 2008, the district court held that Kenmark lacked justification for terminating the contract. The court ruled that Kenmark did not, by virtue of settling, "lose" the lawsuit brought by Aspex. Kenmark was thus found to be in breach of the contracts. Sae

Biang was held to be entitled to damages for Kenmark's failure to purchase 225,000 units, the amount to be determined after an evidentiary hearing.

Again, the parties filed cross-motions for summary judgment on issues related to damages. As to damages stemming from Kenmark's failure to pay for the 59,600 units comprising its initial order, finished and unfinished, the district court found no dispute. As to the finished goods, Sae Biang was held to be entitled to recovery under N.Y.U.C.C. § 2-708(1) based on the agreed price of $13 per unit.[1] As to the unfinished goods, the court effectively found that Sae Biang acknowledged mitigating its losses by selling approximately 40,600 units at almost $13 per unit, and thus withdrew its claim for damages for the unfinished goods. Finally, the court held that damages related to future orders would also be measured under § 2-708(1). Sae Biang was held not to be entitled to damages for lost profits under § 2-708(2) because the contracts did not establish a "fixed price," and a "reasonable price" was not reasonably determinable under the circumstances.

The district court conducted a three-day bench trial on damages on March 22-24, 2010. The court's findings of fact and conclusions of law were filed on September 30, 2010 and judgment was entered on October 7, 2010. The court awarded Sae Biang $147,566.50 in damages, plus prejudgment interest at the rate of 9% (yielding a total of $272,735.34), and postjudgment interest at the rate of .25%, along with costs.

---

[1]New York law governs construction and enforcement of the contracts.

On appeal, Kenmark challenges the ruling that its termination of the contracts was not justified; Sae Biang challenges the court's denial of damages for unfinished goods and denial of lost-profits damages for future orders.

## II. ANALYSIS

### A. Standard of Review

The district court's summary judgment rulings are reviewed de novo. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *White*, 533 F.3d at 390. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Id.* A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id*. at 298-99.

### B. Kenmark's Cross-Appeal, No. 10-6430

Kenmark challenges the district court's summary judgment holding that Kenmark did not, by virtue of its settling, "lose" the Aspex litigation. There is no dispute about the material facts to

which the district court applied the contract language. Nor does either side seriously argue that the

relevant contract language is ambiguous, such that extrinsic evidence of the parties' intent need be

considered. The issue presented tests the meaning of contract terms that both sides contend are

unambiguous. The relevant language is identical in both contracts. Kenmark relies on the following

provisions:

> 15.4 Licensee's Right to Terminate – In the event that Licensee *loses any such suit* as mentioned in 8.1, Licensee shall have the right to terminate this Agreement but shall still be responsible for all obligations under Section 16.

> 8.1 Licensee is responsible for obtaining independent legal advice with respect to the Eyewear Patent and whether it infringes any other patents owned by third parties. It is further acknowledged that, regardless of the good legal opinion, there is a likelihood of malicious or nuisance suits in relation to the sale of Eyewear Products which use the Eyewear Patent. The Licensor does not indemnify the Licensee in any way, save to cooperate with the Licensee in supplying any technical evidence which may assist in the defense of such claims.

R. 80-3, Distribution License Agreement (emphasis added).

The contracts do not define the term "loses," as used in § 15.4. Because the parties did not

give the term any specialized meaning, Kenmark agrees with the district court that the term should

be given its plain and ordinary or generally prevailing meaning. The district court held that Kenmark

did not "lose" the Aspex lawsuit (i.e., did not suffer an unfavorable adjudication by a court), but

rather "settled" it (i.e., reached a negotiated, non-judicial resolution). However, Kenmark insists that

its settlement was the functional equivalent of a loss, because defeat was imminent. Kenmark's

patent lawyer had given his opinion that Aspex's patent was valid and that Kenmark's marketing of

the Sae Biang products was infringing. It was thus apparent, argues Kenmark, that this was no

"malicious or nuisance suit" that it was obliged to defend; this was a meritorious suit. Surely, Kenmark argues, "loses" should not be interpreted as requiring a licensee to interpose frivolous defenses or violate the strong public policy favoring settlement of disputed claims. Kenmark criticizes the district court's definition because it fails to specify *how much* the licensee has to fight before the litigation may legitimately be deemed lost.

The district court was not obliged to prescribe a comprehensive definition of "loses." The court only had to determine, on the undisputed facts presented, whether Kenmark had sustained the sort of loss in litigation that would have justified its termination of the contracts. Under the undisputed facts, we conclude the district court did not err in ruling as a matter of law that Kenmark did not suffer such a loss before it repudiated the contracts.

Kenmark contends "defeat was imminent" when it repudiated the contracts—a mere three weeks after being served with Aspex's complaint. An adjudication on the merits was hardly "imminent" three weeks after the Aspex complaint was filed. The intricacies of patent law are confounding. Construction of patent claim descriptions is nuanced and counter-intuitive. Subtle differences in the science or engineering of product designs often defy quick and easy classification. The notion that Kenmark was faced with no reasonable choice but to settle three weeks after being served with suit is preposterous. Moreover, Kenmark's decision to terminate the contracts was based solely on the opinion of the same lawyer who, just months earlier, had given Kenmark the apparently flawed opinion that its distribution of the magnetic clip-on eyewear products would *not* infringe any existing patent. Yet, despite evident cause to question the reliability of counsel's opinion, Kenmark

unhesitatingly acted on it—without even consulting with Suk Jae Lee or others at Sae Biang about the relationship between their products and the asserted '747 patent. In fact, when Lee offered assistance, he was unceremoniously rebuffed and ignored. Instead of taking a more reasonable, deliberate approach—such as entering into a stand-still agreement with Aspex pending a careful investigation of the facts and law—Kenmark repudiated the contracts within three weeks and settled the Aspex lawsuit less than two months after being served.

It is also noteworthy that Kenmark does not seriously dispute the district court's observation that Suk Jae Lee's patent applications were granted and its patents issued not long after the Aspex suit was filed; one on May 15, 2001 (U.S. Patent No. 6,231,179, "Method and device of coupling spectacles and clip-on sun-shades with each other"), and one on April 23, 2002 (U.S. Patent No. 6,375,321, "Method and device of coupling spectacles and clip-on sun-shades with each other"). That is, less than one month after Kenmark repudiated the contracts, a patent had issued that might well have significantly impacted the merits of Aspex's infringement claim.[2] While Kenmark may not have known that issuance of these patents was imminent, this development highlights the unreasonableness of Kenmark's precipitous repudiation.

Kenmark's actions also appear to be in manifest disregard of the covenant of good faith and fair dealing which New York law reads into every contract. *See Mendez v. Bank of Am. Home Loans*

---

[2]In July 2005, Sae Biang obtained its own opinion of patent counsel, to the effect that Sae Biang's magnetic clip-on eyeglasses did not infringe the '747 patent, either literally or by equivalents. R. 82-28, 82-29, Canelias Letter. This opinion relied in part on review of Lee's '179 and '321 patents.

*Servicing, LP*, — F.Supp.2d —, 2012 WL 112506 at *10 (E.D. N.Y. Jan. 14, 2012). Pursuant to this covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006)). While the covenant does not add any substantive provision to the parties' contract, it imposes an obligation consistent with the mutually agreed upon terms in the contract. *Id.* (citing *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005)). *See also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98-99 (2d Cir. 2007) (same); N.Y.U.C.C. § 1-203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement.").

Kenmark's hurry to capitulate in the face of Aspex's complaint was not consonant with the duty of good faith owed to Sae Biang. Kenmark's actions were not justified under any reasonable construction of the provision granting Kenmark a right of termination in the event that it "lost" an infringement suit. By repudiating the contracts and settling the Aspex lawsuit based on its patent lawyer's preliminary assessment of the merits of Aspex's claim without even consulting with its licensor Sae Biang, Kenmark relied on an unreasonable construction of the termination provision, thereby destroying Sae Biang's right to receive the fruits of the parties' contracts. We find no error in the district court's partial summary judgment ruling that Kenmark breached the parties' contracts by prematurely repudiating them.

**C. Sae Biang's Appeal (No. 10-6349)**

**1.** *Damages for Unfinished Goods*

There is no appellate challenge to the amount of damages awarded to Sae Biang in connection with the finished goods, the initial 19,200 units. The district court denied Sae Biang recovery of damages in connection with unfinished goods, i.e., eyewear products that were part of the initial order but were only partially completed at the time of Kenmark's repudiation. The ruling was based on concessions made by Sae Biang, both in its summary judgment briefing and oral arguments. Sae Biang now contends the district court misunderstood the nature and intendment of its concessions. It contends that it conceded, for purposes of the summary judgment arguments only, that its mitigating sales of roughly 40,000 units, at approximately $13 per unit, could be applied against the damages it would otherwise seek for the 38,400 unfinished goods—goods which never were actually completed and sold, except for scrap. Based on this concession, made for the purposes of argument only, Sae Biang contends the district court made an erroneous finding of fact, to the effect that "Sae Biang was able to sell the partially completed units for an average price of approximately $13 per unit." R. 223, Amended Findings and Conclusions at 2.

While the district court's finding of fact regarding the actual disposition of the unfinished goods may be erroneous, Sae Biang has failed to show how the district court misapplied the concession in its determination of Sae Biang's recoverable damages. Sae Biang's counsel clearly acknowledged that the proceeds from its mitigation sales of some 40,000 units were, in relation to the damages it would otherwise seek for the unfinished goods, "offsetting" or "a wash." R. 220, Hearing Tr. at 19-20, 31. Counsel thus explained that "we will take those unfinished goods out of the equation completely." *Id.* at 20. Consistent with these representations, the district court

appropriately considered the claim for damages for unfinished goods withdrawn. Notwithstanding any factual inaccuracy in the court's findings of fact, Sae Biang has failed to show that the judgment was materially affected by the court's construal of Sae Biang's concession.

## 2. *Damages for Future Orders*

The district court held that Sae Biang's damages for loss of future orders would be measured under N.Y.U.C.C. § 2-708:

> (1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but less expenses saved as a consequence of the buyer's breach.

> (2) If the measure of damages provided in subsection (1) *is inadequate* to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

R. 180, Memorandum Opinion at 4 (emphasis in opinion). As between these two paragraphs, the district court held that subsection (1) was the more appropriate measure of Sae Biang's damages for its loss of future orders. The court rejected Sae Biang's argument that the measure of damages provided in subsection (1) was "inadequate" and that Sae Biang should therefore be entitled to recover lost profits under subsection (2).

The district court reduced subsection (1) to a mathematical formula: Damages = [(Unpaid Contract Price) - (Market Price at Time & Place of Tender)] + (Incidentals) - (Expenses Saved).

Because the price term in the parties' contracts had been left open, the court recognized, per N.Y.U.C.C. § 2-305(1), that "Reasonable Price at Time of Delivery" should be substituted for "Unpaid Contract Price." The first half of the equation thus became essentially, [(Market Price at Time of Delivery) - (Market Price at Time & Place of Tender)]. This subtraction essentially yielded a difference of "zero," irrespective of what the market price might be, meaning that Sae Biang's damages would be limited to recovery of incidental damages less expenses saved. The court held this measure of damages was not legally "inadequate" and subsection (2) was therefore not triggered, because Sae Biang's "disappointment" was the result of the parties' contractual agreement to leave the price term open. The court also held that recovery of lost profits under subsection (2) was inappropriate because § 2-708(2) was designed to prevent injustice for "lost volume sellers" of "fixed price articles." The court held the instant future orders were anything but fixed price articles and determined that lost profits damages were too speculative to be awarded.

We find no error in the district court's analysis. Under New York law, a party is entitled to recover breach-of-contract damages in the form of lost profits "only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Tractebel*, 487 F.3d at 109. Sae Biang has the burden of showing a "stable foundation for a reasonable estimate" of the damage incurred as a result of the breach. *Id.* at 110 (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) (applying New York law)). Generally, "all damages resulting necessarily and immediately

and directly from the breach are recoverable, and not those that are contingent and uncertain." *Id.* at 111 n.22 (quoting *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931)).

Here, Kenmark obligated itself to purchase 225,000 units at undetermined times during a three-year term. The parties agreed to a purchase price of $13 per unit only in connection with the initial order, for the first 57,600 units. The purchase price for future orders was left open, to be negotiated in good faith at later dates, subject to evolving circumstances. Among the evolving circumstances the parties immediately encountered was the filing of the facially meritorious patent-infringement action by Aspex. This development can hardly be deemed to have had no effect on the parties' anticipated future-orders price negotiations had the contracts not been terminated. The Aspex suit was not totally unanticipated and Kenmark's reaction to it was unreasonable and unjustified. Yet, the filing of the suit undeniably cast a cloud over the marketability of Sae Biang's eyewear products and rendered the reasonable market price contingent and uncertain.

The district court thus properly rejected Sea Biang's argument that the parties' initially agreed-to price of $13 can be used as a reliable starting point for measuring lost profits. The price agreed to when the products were believed to be marketable offers little reliable guidance as to what figure the parties could be expected to reasonably agree to in good faith after marketability had been seriously called into question by the Aspex suit. We concur in the district court's determination that Sae Biang has not carried its burden of showing a stable foundation for reasonable estimate of lost profits. This precondition to the award of lost profits damages under New York law having not been

met, it follows that the district court's application of N.Y.U.C.C. § 2-708(1) to measure damages in

connection with future orders was not erroneous.

### III.  CONCLUSION

Accordingly, both Kenmark's and Sae Biang's appellate claims of error are overruled and

the district court's judgment is **AFFIRMED**.